## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

|  |  |
|---|---|
| THE UNITED STATES OF AMERICA ex rel. MICHELE COFFMAN ) ) ) ) | |
| Plaintiffs, ) | |
| v. ) | **CIVIL ACTION CASE NO.** |
| THE CITY OF LEAVENWORTH, KANSAS ) ) ) | 14-cv-2538 JWL/TJJ |
| Defendant ) | *FILED IN CAMERA and UNDER SEAL* |
| ) ) ) ) | **FALSE CLAIMS ACT COMPLAINT** |

### INTRODUCTORY STATEMENT

The Plaintiff, MICHELE COFFMAN, by and through her counsel of record, brings this

action on behalf of the United States of America against the CITY OF LEAVENWORTH,

KANSAS (hereinafter "Leavenworth," or the "Defendant") pursuant to the Qui Tam provisions

of the Federal False Claims Act, 31 U.S.C. §§3729-33 ("Federal FCA" or "FCA"),(referred to

herein as "Qui Tam Action"). Pursuant to 31 U.S.C. §3730(b)(2), this action is brought in camera

and under seal.

Plaintiff Michele Coffman also brings this action on her own behalf under the FCA, 31

U.S.C. §3730(h), seeking redress for Defendant LEAVENWORTH's wrongful and unlawful

1

retaliation for her complaints made about illegal conduct by Defendant, and her efforts to stop one or more violations of the FCA by Defendant.

Plaintiff alleges that Defendant LEAVENWORTH has violated the Federal FCA, by presenting, or causing to be presented, false claims to the Federal Emergency Management Agency ("FEMA") for reimbursement for expenses not owed by FEMA, including the replacement of a city water pipe and bridge repair, which were damaged prior to the 2011 flood for which FEMA funds were designated to repair. Defendants' actions in submitting claims for payment which included charges to FEMA for replacement of sections of pre-existing broken pipe and pre-existing bridge damage constituted violations of the FCA.

Plaintiff also alleges that Defendant LEAVENWORTH has violated the Federal FCA, by making false express and implied certifications of compliance with "all applicable laws and regulations" as a condition of securing federal payments under procurement contracts for sewage disposal and waste water treatment services. These contracts were with the United States Department of the Army, the Veterans Administration, and the Department of Justice's Federal Bureau of Prisons, each located at Fort Leavenworth, Kansas.

These false certifications and the knowing failure to comply with these contract terms have caused false claims for payment to be submitted and paid by the United States Department of the Army [Fort Leavenworth], the United States Veterans Administration [Veterans Administration Medical Center at Fort Leavenworth], and the United States Department of Justice Bureau of Prisons [United States Penitentiary at Leavenworth, Kansas].

Plaintiff/Relator further alleges that Defendant LEAVENWORTH, by and through its agents, has violated the whistleblower's protection section of the FCA, 31 U.S.C. section

2

3730(h), by unlawfully retaliating against the Plaintiff for her attempts to report, to correct, and/or to stop the illegal conduct described herein.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this action under the Federal FCA pursuant to 28 U.S.C. §§1331 and 1345, and 31 U.S.C. §§3732(a) and 3730.

2.      Venue is appropriate as to the Defendant as the Defendant can be found in, resides in, and/or transacts business in this judicial district. Therefore, within the meaning of 28 U.S.C. §1391(b) and (c) and 31 U.S.C. §3732(a), venue is proper.

3.      To Relator's knowledge, jurisdiction over this action is not barred by 31 U.S.C. 3730(e): there is no civil suit or administrative proceeding involving the allegations and transactions herein to which the United States is a party; there has been no "public disclosure" of these allegations or transactions; and Relator is the "original source" of the information on which these allegations are based.

## THE PARTIES

4.      Plaintiff Michele Coffman is a citizen of the United States of America and a resident of Kansas. Plaintiff began work for Defendant LEAVENWORTH in April 2010 at Defendant's Wastewater Treatment Plant. From August 2012 until October 2013, she was employed by Defendant LEAVENWORTH as Assistant Superintendent of the Plant. She brings this action based upon direct and unique information obtained during the period of her employment as Assistant Superintendent of Defendant LEAVENWORTH'S Wastewater Treatment Plant. As characterized by the Federal False Claims Act, Plaintiff will often be referred to as "Relator" hereafter. Ms. Coffman has provided some of this information to the

3

United States and will provide additional information through a Relator's "Disclosure Statement" to be served on the United States.

     5.      Defendant LEAVENWORTH is a municipal government in the State of Kansas. Defendant acts in the role of a municipal government and municipal department in providing sewage and waste water treatment services for the city of Leavenworth, Kansas. Defendant LEAVENWORTH also acts in the role of private contractor to provide sewage and wastewater treatment services to the United States Department of the Army, the United States Veterans Administration, and the United States Department of Justice Bureau of Prisons, at Fort Leavenworth, Kansas. The combined annual contracts with these federal departments and agencies involved millions of dollars over the period in question.

## FEDERAL PROGRAMS

     6.      The United States' Federal Emergency Management Agency ("FEMA") is an agency of the federal government created by 6 U.S.C. §313 et seq., and is funded by taxpayer revenue. FEMA serves to provide public and private flood insurance, and also provides and oversees all federal disaster relief funding and operations.

     7.      The United States' Department of the Army is a department within the United States' Department of Defense (See 10 U.S.C. §3001 et seq.,) and is funded entirely by federal taxpayer revenue.

     8.      The United States Department of Veterans Affairs and the Veterans' Administration was created by 38 U.S.C. §301 et seq., and is funded entirely by federal taxpayer revenue.

4

9.      The United States Department of Justice Bureau of Prisons is a department

overseen by the United States Department of Justice and was created by 18 U.S.C. §301 et seq.,

and is funded entirely by taxpayer revenue. This Bureau administers and oversees all federal

prisons within the United States.


## FEDERAL AND STATE LAWS IMPLICATED IN SEWAGE AND WASTEWATER TREATMENT MANAGEMENT INCLUDE:

10.     The Federal Water Pollution Control Act (Clean Water Act), Section 101, 301,

302, 309 & 402.

11.     The Federal Safe Drinking Water Act.

12.     The Federal Solid Waste Disposal Act, including Sec. 6001.

13.     The Federal Toxic Substances Control Act.

14.     The Federal Comprehensive Environmental Response, Compensation and

Liability Act.

15.     The Federal Occupational Safety and Health Act of 1970.

16.     The Federal Resource Conservation and Recovery Act 42 U.S.C. 6924 (RCRA

3004)

17.     40 CFR Part 403- General Pretreatment Regulations for Existing and New

Sources of Pollution.

18.     40 CFR 414- Organic Chemicals, Plastics, and Synthetic Fibers

19.     40 CFR 501- State Sludge Management Program Regulations

20.     40 CFR Part 503—Standards for the Use or Disposal of Sewage Sludge

21.     K.S.A. 65-3437 Disposal of Hazardous Waste without a permit

5

22.    K.S.A. 65-3441(a)(1),(3),(4),(6),(9), (11) Disposal of Hazardous Waste Unlawful Acts

23.    K.S.A. 65-3441(b),(c),(d) Disposal of Hazardous Waste Penalties

24.    K.S.A. 65-3442(a) Same; Cleanup costs

25.    K.S.A. 65-164 illegal to discharge sewer into any waters of the State

26.    K.A.R. 28-16-28(b) through (f) Surface Water Quality Standards

27.    K.A.R. 28-16-1 through 28(a) Point Source Discharge Permit

28.    Article 16 Surface Water Quality Standards; K.A.R. 28-16-28(e)(1) through (8)

29.    K.A.R. 28-5-1 through 28-5-9 Sewage and Excreta Disposal

30.    K.A.R. 28-5-6 Discharge of domestic waste and 28-5-7 Private Sewer Systems

31.    K.S.A. 65-164 et seq. Sewage; definition; complaints, investigations, orders; administrative review.


## FEDERAL CONTRACTS IN QUESTION REQUIRE MATERIAL COMPLIANCE WITH FEDERAL, STATE AND LOCAL LAWS AND REGULATIONS

32.    The sewage disposal and wastewater treatment contracts Defendant Leavenworth entered into with federal departments or agencies required compliance with federal, state and local laws and regulations in order to protect the individuals those departments or agencies served, the employees of the wastewater treatment plant, members of the public who might otherwise come in contact with unsafe contamination, and the safety of individuals in the community or downstream who could be harmed by the unsafe treatment or disposal of sewage under the contract.

33.    It is also for the reasons above that the several whistleblower protection statutes contained in those environmental, sewage, treatment and handling statutes identified above are

6

not excluded from the federal, state and local laws and regulations the defendant must comply
with as a term and condition of the federal contracts involved in this case.

34.     Compliance with these environmental, sewage, treatment and handling laws and
regulations was a material term of the contract for which payment has been, and continues to be,
made by federal departments or agencies.

35.     The specific language of Defendant's contract with the Department of the Army
reads as follows:

> *Section C- Descriptions and Specifications*
>
> *STATEMENT OF WORK*
>
> *Statement of Work*
> *City of Leavenworth Sewer Contract*
>
> *SW-1 Description of Work*
> *        The City of Leavenworth (The Contractor) shall furnish and
> maintain a sanitary sewer connection and a sanitary sewer service as
> required by Fort Leavenworth (The Government) and shall receive, carry,
> treat, and dispose of all sanitary sewage originating at the Point of
> Delivery in such amounts as the Government will release into the
> Contractor's sanitary sewer system and in a manner and by such means as
> will constitute no hazard to the public health. The Contractor shall
> operate his sewage disposal and treatment facilities in conformity with
> applicable laws, rules and regulations established by Federal, state and
> local authorities. The period of performance for this requirement is 01 Jul
> 06 to 30 Jun 16.*
>
> *SW-2 Specific Premises to be served.*
> *U.S. Army Combined Arms Center and Fort Leavenworth, Fort
> Leavenworth, Kansas*

36.     The Defendant's contracts with the Veteran's Administration and with the
Department of Justice Federal Bureau of Prisons contain similar terms and conditions.

37.     Billing any governmental department or agency full price for services that were
either not actually rendered, or for services that were only partly rendered, may constitute a

violation of the false claims act each time a claim for payment is submitted, or a payment is made to, and retained by, the contractor.

## FEDERAL FALSE CLAIMS ACT

38.     The Federal False Claims Act, 31 U.S.C. §3729(a)(1)(A) makes "knowingly" presenting or causing to be presented to the United States any false or fraudulent claim for payment, a violation of federal law.

39.     The Federal FCA, 31 U.S.C. §3729(a)(1)(B) makes "knowingly" making, using or causing to be made or used, a false record or statement material to a false or fraudulent claim, in order to get a false or fraudulent claim paid or approved by the Government, a violation of federal law.

40.     The Federal FCA, 31 U.S.C. §3729(a)(1)(D) makes having possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivering, or causing to be delivered, less than that amount of money or property, a violation of federal law.

41.     The Federal FCA, 31 U.S.C. §3729(a)(1)(C) makes conspiring to commit any of the above acts under the Federal False Claims Act, a violation of federal law.

42.     The Federal FCA defines "knowing" as that a person, with respect to information, 1) has actual knowledge of the information, 2) acts in deliberate ignorance of the truth or falsity of the information, or 3) acts in reckless disregard of the truth or falsity of the information, and requires no specific intent to defraud.

43.     The Federal FCA defines a "claim" to include any request or demand, whether under contract or otherwise, for money or property, whether or not the United States has title to the money or property, which is presented to an officer, employee or agent of the United States;

or which is made to a contractor, grantee, or other recipient (including a state or local governmental agency), if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, *and if the United States Government provides or has provided any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.* (Emphasis added.)

44.     The anti-retaliation provision of the Federal FCA, 31 U.S.C. 3730(h), makes it unlawful to discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of lawful acts done by the employee in furtherance of an action under that section or other efforts to stop 1 or more violations of the Federal False Claims Act.

45.     Statutory relief under this provision entitles the employee to all relief necessary to make the employee whole and expressly includes reinstatement with the same seniority status, benefits and salary which that employee would have had but for the discrimination, or front pay in the alternative; 2 times the amount of back pay; interest on the back pay; litigation costs and reasonable attorneys' fees, and compensation for any special damages sustained as a result of the discrimination, which has been held to include even emotional distress.

## FACTS AND ALLEGATIONS

46.     Relator began working for the Leavenworth Wastewater Treatment Plant in April of 2010 as a Class I Operator.

47.     In or about June 2011, Relator became a Class II Operator and did additional projects for the City of Leavenworth, Kansans, which included the Manhole Cover Project.

9

48.     Relator worked hard, investing herself into this career path. And in January 2012, Relator was made the City of Leavenworth's Resident Project Representative for the Construction of the $4+ million dollar UV Building.

49.     Relator received the City of Leavenworth's Employee of the Second Quarter in 2012.

50.     Relator received high marks on her yearly evaluation from Leavenworth's Wastewater Treatment Plant Superintendent, Charlie Klingler ("Klingler"), in July 2012.

51.     Relator was promoted to the position of Assistant Superintendent of Leavenworth's Wastewater Treatment Plant in August 2012.

52.     Relator received the City of Leavenworth's Employee of the Year award in December 2012.

53.     One of Relator's duties as the Assistant Superintendent for the Leavenworth Wastewater Treatment Plant, was to check on the status of the work orders on the Sewer lines and at the Plant, in order to make sure the contractors were informed when they were awarded bids, and to review how assigned or contracted work was progressing.

54.     As Relator was going through contracts and work orders in the middle of March 2013, she realized that the work order for the replacement of the sewer line and manhole, which crosses the creek in front of the Plant, was missing.

55.     The work for this sewer line and manhole was just beginning. And, until work like this is completed, the paperwork remains filed with the Wastewater Administrative Clerk.

56.     When Relator asked the Administrative Clerk, Charity Frey, where the documents were, Frey responded that she was not sure and that it had not come across her desk.

57.     Relator asked several of the Operators, including the Plant Team Leader, if they knew about this work order.

58.     Relator was informed that the work had been turned into FEMA for the July 2011 Flood Damage.

59.     The Operators and Plant Team Leader also informed Relator that Klingler had informed the Operators of this in one of the morning meetings he had around the time Relator began working as the Resident Project Representative for the UV Building in or about January 2012.

60.     This constituted fraud on the United States government as it included knowingly false claims for payment from FEMA for repair to damage that predated the flood, and which records prove was being discussed by Klingler, Public Works Director, Mike McDonald ("McDonald"), and others in meetings planning for needed repairs nearly one full year before the 2011 flood even occurred.

61.     During the following week, after hearing this, Relator began pulling all the work orders and checking the sewer database for the work and inspections the Plant Operators had done on this broken line.

62.     All of the work and inspections for this line took place in 2010 and 2011 before the flood.

63.     There was no new work and there were no new inspections done to this line after the flood.

64.     The following week the Leavenworth City Manager, Scott Miller ("Miller"), called Relator into his office to ask her questions about a complaint he was investigating

11

regarding serious safety violations committed by Wastewater Treatment Plant Superintendent, Charlie Klingler, in addition to several other concerns in the Department.

65.     Relator and Miller discussed the safety violations at the plant and the broken sewer pipe leaking into the creek which was turned into FEMA to pay for its repairs when it was damaged *before* the 2011 flood.

66.     Relator informed Miller that she had addressed much of this with her chain of command, including Deputy Public Works Director Bob Patzwald ("Patzwald"), and McDonald, in February 2013.

67.     Relator told Miller that she was still looking into the issue regarding the broken sewer pipe and the costs being charged to FEMA, but that she was almost certain at that point that it had been reported wrongly to FEMA as flood damage for which federal funds were made available for disaster relief.

68.     Miller said he was unaware the pipe had been broken. He also told Relator that this meeting would be confidential and reassured her that she would not be retaliated against because of the issues she had raised.

69.     On or about April 1, 2013, the City Manager Miller came to the Treatment Plant and spoke with Klingler, and then spoke with several of the Operators.

70.     The following day, on or about April 2, 2013, Miller spoke with several more Operators.

71.     On or about April 3, 2013, Klingler informed Relator that Klingler was preoccupied with other issues and instructed Relator to email him from now on if any problems come up.

72.     For the next few weeks, Klingler was rarely at the Plant.  And when he was at the Plant his office door remained closed.

73.     On or about Friday April 12, 2013, Klingler began taking an interest in Plant Operations again.

74.     On or about Tuesday April 16, 2013, Relator received a negative memorandum from Klingler which covered issues related to how Relator had handled Plant Operations for the prior few weeks, and also included a claim that Klingler did not receive documentation for sick leave Relator had taken in March. Klingler instructed Relator to respond back in writing.

75.     Due to how fabricated the issues in the memorandum were, and similar targeting Relator had witnessed against past employees, it was at this moment that Relator first realized she was being targeted for the meeting she had with Miller and the issues raised, specifically including the unlawful billing of FEMA and the United States government for repair work that predated, and was unrelated to, the flooding for which FEMA funds were designated.

76.     Relator's first thought was to inform Miller she believed she was being retaliated against, but, due to having to follow employment policies and procedures, Relator was required to take this matter through her chain of command.

77.     Relator responded to each of Klingler's concerns by email shortly after 2:00pm on April 18, 2013 and ended the response by informing him that she felt the memo was not justified, and that she was planning to contact his supervisor, Bob Patzwald.

78.     Within twenty minutes, Klingler left the Plant for the remainder of the day.

79.     At 5:05pm, Relator received an email from Mike McDonald, Director of Public Works for the City of Leavenworth, calling for a meeting on Friday April 19, 2013 between McDonald, Klingler and Relator.

80.     During this meeting, Klingler remained silent, and McDonald began the meeting by informing Relator that he had helped Klingler draft the email and memorandum and that he was extremely upset by Relator's response.

81.     Several times in this meeting McDonald made reference to items Relator had discussed in the meeting she had with City Manager Miller a few weeks earlier. And, at one point, McDonald told Relator that, after he and Klingler had finished the memo, they had run it by City Manager Miller, and that Miller was already aware of it.

82.     Relator informed McDonald several times during this meeting that she believed she was being retaliated against and, by the end of the meeting, McDonald's temper and hostility had surfaced and Relator was extremely worried.

83.     Relator told McDonald that she felt this was not going well, and she wanted to speak to the City Manager who was next in her chain of command.  McDonald was screaming by this point and shouted at Relator to go see City Manager Miller.

84.     After the meeting, Relator went to the bathroom for close to ten minutes to calm down. She was very shaken by this meeting and felt confused.

85.     Relator then went down to speak with City Manager Miller to inform him of what was going on, and he told Relator that he never gave any names, and that he was not sure how McDonald and Klingler knew. Miller stated that he was aware of the memorandum and said not to worry about it. He called it "bogus" and said he would take care of it.

86.     Miller never contacted nor communicated with Relator again.

87.     Not long after Relator went back to work she received an email of a list of items related to the H2S Gas System that she was tasked to complete.

14

88.     Then the next work day, Monday April 22, 2013, Relator received an additional list of tasks she needed to do.

89.     These weekly lists were sent to Relator by Klingler from this point to the end of her employment with the Treatment Plant, and Klingler labeled them "In addition to normal WPC Operations."

90.     Klingler constantly gave Relator additional work in addition to these lists, either by email or verbally.  And Relator's workload drastically increased to the point she had to put in extremely long hours at work just to try to keep up with these additional duties, on top of regular everyday WPC operations.

91.     Relator's normal 7:30am to 4:00pm work day became a 6:30am to 8:00pm or 9:00pm work day now in readily apparent retaliation for raising concerns about fraud being committed against FEMA and the United States government.

92.     Relator noticed that most of these additional items she was assigned, whether bids, spreadsheets, or parts and equipment inventory were never actually needed, and that once she completed them and turned them in nothing ever came of them.

93.     Instead, it seems these assignments were merely additional tasks to add to Relator's workload without need, and given as a means for negative employment actions against her if she failed to complete any of these additional and needless tasks satisfactorily or on time.

94.     Relator would email Klingler when an assignment was complete and ask him to give her a time when he wanted to go over it to discuss it.  There was seldom ever any follow up on Klingler's part by this point.

95.     Relator began researching the governmental fraud issues through the City files, and she discovered the City Manager, Mr. Miller, not only knew about the broken pipe and other

pre-flood damage the City had billed to FEMA as flood damage, but that Miller was involved in the fraud himself.

96.    Relator realized then that the only help she might get for protection through the City would be with the Employee Council.

97.    Relator spoke with her Employee Council representative, Mr. Reginald Williams, to see if she could go through the Grievance Process with the City of Leavenworth's Employee Council.

98.    Williams spoke with Administrative Clerk, Becky Beaver, who informed him that, since the negative memorandum was not labeled reprimand, it was not grievable, and the Employee Council did not handle workplace retaliation. Relator was also informed that the Employee Committee could not help either, since they only deal with terminations, suspension, and demotions.

99.    Due to this response, Relator began making phone calls, which can be documented with cell phone records, beginning at the end of April through May of 2013, seeking help in the midst of this work environment and on-going retaliation.

100.   Relator contacted several organizations including the Kansas Department of Labor and the EEOC.

101.   The organizations Relator contacted either only dealt with Title VII violations or did not know who she needed to speak to regarding workplace retaliation by a municipality.

102.   Relator also contacted FEMA, but the response was the same with their helpline. And one gentleman there directed Relator to contact a lawyer, wished her good luck, and quoted a bible verse to help with the job stress Relator was going through.

103.     Several of the Plant Operators had approached Relator individually to voice their concern regarding the workload Relator was now being assigned. One had driven by the Plant on several nights just to see if Relator was still working. Each of the Operators expressed the belief that Relator was being assigned this extra workload so that she would not have time to study for her Class IV Operator exam, which she was required to pass in order to keep her job as Assistant Superintendent.

104.     Relator was already realizing this likely motive herself behind these increased assignments.

105.     Relator filed a report with OSHA on May 19, 2013 with regard to the workplace safety violations. However, OSHA informed Relator that, because her employer was a municipality in Kansas, the plant was outside of their jurisdiction.

106.     OSHA instead directed Relator to file an EEOC retaliation complaint since Relator was the only female and the only one being retaliated against.

107.     Because Relator had never been denied promotions based on her gender, the issues raised by Relator involved fraud on the government and not gender issues, and the retaliation that ensued was clearly triggered by the issues of fraud and not gender, this also was incorrect guidance.

108.     The woman Relator spoke with at the EEOC stated that she was not allowed to direct Relator regarding whom to talk with, but she hinted that Relator should search the internet for where she needed to go, and that private legal help was an option she should consider.

109.     On or about Friday May 24, 2013, Relator managed to get in touch with a FEMA lawyer, Mr. Kris Kenabaker ("Kenabaker").

110.    Relator gave Kenebaker a brief review of what had transpired, as well as the

retaliation she was experiencing, without identifying herself or her employer out of fear of even

greater retaliation.

111.    Kenebaker and his supervisor talked to Relator on the phone and they directed

Relator to contact Ms. Mary Allen Montinet ("Montinet"), who was one of FEMA's flood

lawyers.  They encouraged Relator to contact her and to give her Relator's information.  They

said that Relator was doing the right thing, but that Relator would have to get a private attorney

for the retaliation issues since FEMA does not handle that.

112.    When Relator attempted to contact Montinet, she was already gone for the

weekend.  And, since it was Memorial Day weekend, Relator was told Ms. Montinet would not

be in until Tuesday May 28, 2013.

113.    Relator spoke with a lawyer in the interim who informed her that, for her own

protection, she should not do anything further without legal representation.

114.    Relator then spoke with several lawyers. Some would only take the case if she

was terminated. Others did not practice in the applicable field of law.  Accordingly, Relator was

left to continue to face increasing retaliation day after day at work with no protection, no

assistance, and no place to turn for help.

115.    In May through June 2013, Relator's workload continued to increase. And

anytime Relator informed her Supervisor, Klingler, whether verbally or in emails, of her

workload or that she needed help, Klingler would respond only by assigning Relator additional

work.

116.    In fact, it seemed that any statement that the workload was too much or that

Relator needed help was received by Supervisors as a message that the retaliation was working and that Relator was breaking if they just continued to add on to her workload.

117.    Relator, accordingly, stopped asking for help from her chain of command also.

118.    As a result of the added assignments and increasingly long work days, Relator also had very little time to study for her Class IV exam, which would cause her to lose her job as Assistant Superintendent if she could not pass it.

119.    In the beginning of June of 2013, Relator took five days of vacation and, at this time, due to the stress from her work environment, and with the hours she was putting in at work to keep up with these additional tasks, Relator's family informed her that they were worried about her health. They asked Relator to try not to work over ten hours per day, and to only do what she could at work.

120.    When Relator returned to work, Klingler, and Lona Lanter ("Lanter") from Human Resources, had a meeting with Relator to discuss Relator's upcoming exam and what would happen if she did not pass.

121.    Lanter suggested that Relator take the collections test also, so that Relator could go to a Class III slot.

122.    Relator informed them both that, with the ten to twelve hour day workload that had begun in April, Relator was having a hard enough time trying to study for her Class IV exam, let alone studying for a second exam on top of it.

123.    Not only did Relator's workload continue thereafter, but it increased, along with the stress from this retaliation.

19

124.    The staffing at the Plant decreased at one point by half. And when Relator asked for guidance on which jobs needed to get done with this low staffing, Relator was never given a direct answer, but was instead left completely on her own without guidance.

125.    Relator was then also having to do Operator work, with the staff being that short, in order to help the Plant run.

126.    Relator was getting little sleep at this point. She had extreme anxiety going into work and felt profoundly depressed by the time she left work each day.

127.    Relator had no time to study for her exam at this point, and was having a hard time keeping track of the Operators' tasks and all the work that needed to be done.

128.    At this point Relator was doing everything she could just to make it through each day.

129.    Mr. Klingler began to ask for written reports of how Relator handled the jobs that were done during this time, and it often felt to Relator as if Klingler was interrogating Relator to find something she did wrong.

130.    When Klingler and Relator interviewed for the Operator position, one of the Operators, Tim Guardado ("Guardado"), sat in the interviews for training purposes.

131.    They all agreed on the first two individuals to hire for the Operator jobs, but for the third Operator slot, Klingler had a private meeting with Guardado to decide whom to hire for this position.

132.    Relator was not included and was not told of this until later that day, despite being the Assistant Superintendent of the Plant, and despite this being part of her job.

133.    After Relator's exam in August, Relator asked for an extension for her exam, due to this workload.

20

134. When this request was denied, Relator went back through her employee council Representative, Mr. Reginald Williams, to see if this was grievable, due to Relator's extra workload from this retaliation.

135. Mr. Williams checked with Administrative Clerk, Becky Beaver, who informed him since this would affect Relator's employment status, it was grievable.

136. During this same time period, Relator was given her yearly evaluation, which was the lowest evaluation score at the Treatment Plant. And, because this also dealt with retaliation, Relator grieved this as well.

137. Relator had to go through her Chain-of-Command, which was comprised of the very individuals who were retaliating against her, in order to get to the employee council.

138. Relator informed them that, in addition to her normal duties, she was currently working on 10 Projects and dealing with 20 contractors.

139. On the last grievance step, before Relator's grievance went to the employee council, Lona Lanter in Human Resources turned it down and said it was not grievable.

140. Lanter said that since the other Operators who failed the test were not given extensions, giving an extension to one and not the others would be unfair and unjust.

141. However, as Lanter was aware, the City was going to give the other two Operators extensions, but due to the KDHE guidelines, they could not take another KDHE exam by the time their extension would have been up.

142. Conversely, Relator *did* still have time under KDHE guidelines to take her exam later if her employer simply allowed this extension.

143. Further, the City did extend the exam timeline for future employees and current employees who had not passed their exam.

21

144.    Relator had already been to the Emergency room due to the stress from this retaliation, and was then currently being treated for work related stress, anxiety, and depression caused directly by this retaliation.

145.    Relator had informed her Chain-of-Command of this, yet nothing was done.

146.    By this time, Relator had hit her breaking point. And because she was now finding it hard to stay focused and think clearly, she was worried that she was going to do something that would place either one of the Operators or herself in danger.

147.    With guidance from her medical provider, Relator went on FMLA Medical Leave for a month, directly due to the stress she was going through from this hostile work environment.

148.    Relator went to the Emergency room again during this time, and was placed on additional medication.

149.    While Relator was on Medical Leave, the City of Leavenworth posted her job on the Leavenworth City website.

150.    A few days later, Relator received two letters on the same day from the City of Leavenworth.

151.    The first letter stated that Relator's FMLA Medical Leave had been approved.

152.    The second letter stated that Relator was being demoted back to an Operator II status.

153.    The only two other times this position was vacant since Relator began working at the Plant, the City had waited for months before trying to fill it.

154.    Relator continued treatment, and after talking with her healthcare provider, and

realizing what this environment was doing to her health, Relator turned in her resignation on

October 4, 2013, with the advice and counsel of her healthcare provider, rather than returning to

this hostile and retaliatory environment and this demoted position.

155.    Relator had to stop seeing her healthcare provider due to lack of insurance and a

steadily depleting savings account, despite continuing anxiety and health issues caused directly

by this retaliation.

## FRAUD AGAINST THE U.S. BUREAU OF PRISONS, DEPARTMENT OF VETERANS AFFAIRS, AND DEPARTMENT OF THE ARMY

156.    FEMA was not the only federal agency or department that Relator discovered,

during her employment as Assistant Superintendent, had been defrauded.

157.    The City of Leavenworth contracts with the U.S. Department of Justice's Bureau

of Prisons, U.S. Department of Veterans Affairs, and the U.S. Department of the Army to

provide sewage disposal and wastewater treatment for all facilities at Fort Leavenworth in

Kansas.  These contracts total millions of dollars, and they require compliance with all applicable

federal, state and local laws.

158.    The fraud in relation to these claims involves knowingly false certifications or

statements made by the City of Leavenworth, Kansas and its agents in order to get claims paid by

the government in violation of the Federal False Claims Act.

159.    The City of Leavenworth's contracts with each of these federal departments and

agencies require that waste, whether solid waste or waste water, be treated and disposed of in

accordance with all applicable laws. And it is a fundamental test as to the materiality of false

claims made to the government in a contract for payment to ask, "Would the government have

still entered into this particular contract as written had it known at the time what it knows now."

160.    It is believed that the government would not have entered into the contracts it did with the city of Leavenworth if it had known at the time about the extensive environmental violations and Defendant's non-compliance with substantial and material terms of these contracts.

161.    Yet further still, the language of the contracts themselves is clear and unambiguous, and the millions of dollars paid by these federal agencies and departments constitute on their face violations of the Federal False Claims Act.

162.    Each of the federal contracts at issue in the present case require disposal of waste and treatment of water in accordance with all applicable laws. And yet the treatment plant itself was being operated in unsafe conditions for workers.

163.    Additionally, waste was being dumped directly into the creek behind the plant, which then runs into the Missouri river. Particulate contaminants in the water from this creek where the plant was dumping this sewage was measured as exceeding 2,000 times what the law allows.

164.    To correct this, Klingler directed that effluent be dumped in the creek at levels also in extreme violation of any levels allowed by state or federal law, and did so without the legally required permits.

165.    Further, "solid" sewer waste was removed from the waste water and was simply and unlawfully dumped on top of the ground behind the waste water treatment plant by the truck load.

166.    This includes "solid" sewer waste from Fort Leavenworth at Fort Leavenworth, Kansas, including the waste removed under contracts with the Veteran's Administration, the Department of the Army, and the Department of Justice' Bureau of Prisons.

167.    Unbeknownst to the local community, the resulting contamination then affects everything from a local Animal Control facility to a "Price Chopper" grocery store, to "Great Western", and "Tire Town," all of which are located within 100 meters of these dump sites.

168.    When rain water then comes, all of the particulate and contaminants and the bacteria from that exposed sewage then washes into the creek bed that runs into the Missouri river, all in serious violation of numerous federal and state environmental laws that that are non-optional for every waste water treatment facility, whether privately owned or public. And this area is not blocked off to keep people or animals out, nor to notify nor warn the community.

169.    This conduct manifested no sincere effort to comply with any required standards or laws mandated by these federal contracts. The Defendant and Klingler knew that this was Defendant's practice, they clearly knew or should have known that these practices violated a vast array of  federal, state and  local laws, standards and practices, and contractual conditions for payment.

170.    The federal contracts between Defendant and the Veterans Administration, between Defendant and the United States Department of the Army, and between Defendant and the United States Department of Justice Federal Bureau of Prisons, expressly made compliance with these federal, state and local laws a material condition of the contract, and for payment under the contract.

171.    And yet, year after year the city has continued this practice and made knowingly false statements to each of these federal departments and agencies in order to get false claims paid for services the city was not truthfully rendering as obligated under the contract.

172.    The False Claims Act was first enacted to deal with those knowingly selling sick

25

horses, broken rifles and contaminated meat to the federal government and the Union Army.

173.     What the City of Leavenworth, Kansas is knowingly selling the federal government each time that it receives payment from the Veterans Administration, the Bureau of Prisons and the Department of the Army, for services under these contracts is the sewage and wastewater services equivalent of sick horses, broken rifles, and contaminated meat.

174.     This fraud in securing payments under the terms of these contracts has cost the federal government millions of dollars it should not have been charged while the Plant was non-compliant with "all applicable laws."


## COUNT I

## VIOLATIONS OF THE FEDERAL FCA: 31 U.S.C. §3729(a)(1)(A), (B) and (C)


175.     Relator restates and realleges the allegations contained in Paragraphs 1 through 174 above as if each was stated herein in its entirety and said allegations are incorporated herein by reference.

176.     The False Claims Act, 31 U.S.C. §3729(a)(1), prohibits persons from (A) knowingly presenting, or causing to be presented to the United States Government, false claims for payment, or (B) knowingly making, using or causing to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the Government, or (C) conspiring to commit a violation of subparagraph (A) or (B) identified above.

177.     The Defendant knowingly presented, or caused to be presented to the United States Government, false claims for payment by FEMA for repair or replacement of a bridge in disrepair, broken sewer pipe and a manhole cover with funds designated solely for flood

26

recovery and disaster relief. The damage or disrepair to each of these items predated the flood
for which the recovery funds were designated. The Defendants knew that that this damage
predated the flood for which the recovery funds were designated. Nevertheless, Defendant
submitted claims for payment for this damage to be paid by FEMA, even while knowing that the
damage was not caused by the flood for which these funds had been made available and
designated by the federal government.

178. The Defendant also knowingly made, used or caused to be made or used, a false
record or statement material to a false or fraudulent claim, in violation of the False Claims Act,
31 U.S.C. §3729(a)(1)(B), by falsely attesting, certifying, and re-certifying, both expressly and
impliedly, 1) that Defendant Leavenworth's Wastewater Treatment Plant would be and was
receiving, carrying, treating, and disposing of all sewage in a manner and by such means as
would constitute no hazard to the public health, 2) that Defendant Leavenworth's Wastewater
Treatment Plant would be and was operating its sewage disposal and treatment facilities in
conformity with applicable laws, rules and regulations established by Federal, state, and local
authorities, and 3) that Defendant Leavenworth's Wastewater Treatment Plant would comply
with all the requirements of the Federal Water Pollution Control Act (33 U.S.C. 1251 et seq.) and
all regulations and guidelines issued thereunder before the award of the contracts in question.

179. The Defendants made these false certifications and re-certifications in order to
receive, and to continue to receive, federal payments from the Department of Veterans Affairs,
from the Department of the Army, and from the Department of Justice's Bureau of Prisons, and
to receive continuing contracts without Defendant then actually having to make the expenditures
or perform the full work these contracts required of Defendant.

180.     This conduct constitutes a knowing violation the False Claims Act designed and directed by administration and supervisors in a conspiracy to commit violations, and cause others to commit violations, of the False Claims Act in violation of the False Claims Act, 31 U.S.C. §3729(a)(1)(C).

181.     The Defendant directed, participated in, or authorized others to take the actions set forth above, on behalf of Defendant, over a period of years.

182.     The United States has been damaged as a result of Defendant's violations of the False Claims Act because it paid for certain overpayments and ineligible payments totaling millions of dollars.

183.     As set forth in the preceding paragraphs, Defendant has knowingly, with deliberate ignorance, or with reckless disregard for the truth, violated 31 U.S.C. §3729(a)(1)(A), (B) and (C), and has thereby damaged the United States Government by these actions in a specific amount to be determined at trial.

WHEREFORE, Relator Michele Coffman, acting on behalf of and in the name of the United States of America, and on her own behalf, demands and prays that judgment be entered as follows against Defendant under the Federal FCA Counts as follows:

(a) In favor of the United States against the Defendant for treble the amount of damages to FEMA, the United States Department of the Army, the United States Department of Veterans Affairs,  and to the United States Department of Justice Bureau of Prisons, plus maximum civil penalties of Eleven Thousand Dollars ($11,000.00) for each false claim;

(b) In favor of the United States against the Defendant for disgorgement of the profits earned by Defendant as a result of its unlawful conduct.

(c) In favor of the Relator for the maximum amount allowed pursuant to 31 U.S.C. §3730(d) to include all reasonable expenses, attorney fees and costs incurred by Relator;

(d) For all costs of the Federal FCA civil action

(e) In favor of the Relator and the United States for such other and further relief as this Court deems to be just and equitable.

## COUNT II

## RETALIATION IN VIOLATION OF THE FEDERAL FALSE CLAIMS ACT
## 31 U.S.C. §3730(h)

184.    Plaintiff/Relator restates and realleges the allegations contained in Paragraphs 1 through 174 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

185.    Defendant Leavenworth, by and through its agents, harassed, demoted, constructively discharged, caused severe emotional distress and otherwise discriminated against Plaintiff/Relator Coffman, in whole or in part because of her lawful acts taken involving potential violations of the False Claims Act by Defendant. By these actions the Defendant violated the anti-retaliation provisions of the False Claims Act, 31 U.S.C. §3730(h).

186.    Plaintiff/Relator has been damaged as a direct result of these illegal actions. She has suffered great emotional harm, economic harm, and loss of income.

Wherefore, Plaintiff/Relator prays for judgment against Defendant, and requests the Court to enter judgment in her favor in an amount in excess of $75,000 for punitive damages, and all available damages and relief under 31 U.S.C. §3730(h), including, without limitation, two times back pay plus pre- and post-judgment interest, reinstatement or front pay in lieu thereof,

and compensation for any special damages, including emotional distress, and for litigation costs, attorneys' fees, and for such other relief as this Court deems just and reasonable.

## COUNT III

## WHISTLEBLOWER RETALIATION

187.  The Plaintiff incorporates by reference Paragraphs 1 through 174 above as though fully set forth herein.

188.  A reasonably prudent person would have concluded that Defendant, was engaged in activities in violation of rules, regulations or laws pertaining to public health, safety or general welfare.

189.  Defendant, by and through its agents, had knowledge of the Plaintiff reporting and raising concerns regarding violations of rules, regulations or laws.

190.  Public policy pertaining to fraud, theft, misappropriation of funds, and public health and safety is so definite and fixed that it is not subject to any substantial doubt.

191.  The Defendant's stated reason for the harassment, demotion, constructive discharge and emotional distress Plaintiff endured was false or pre-textual.

192.  The Plaintiff's report of Defendant's fraud, safety, and public health violations was a contributing cause of the harassment, demotion, constructive discharge and emotional distress caused by Defendant.

193.  Defendant's conduct toward the Plaintiff was willful and wanton and was in reckless disregard for the Plaintiff.

194.  The Plaintiff has suffered damages as a result of this retaliation, demotion and constructive discharge.

WHEREFORE, Plaintiff prays for judgment against Defendant for back pay, including wage increases and reimbursement of any lost fringe benefits, retirement plan benefits, pension benefits, and Social Security contributions, an award of front pay, emotional pain and suffering, mental anguish, inconvenience, and loss of enjoyment of life, punitive damages, pre-and post-judgment interest, reasonable attorneys' and expert fees, and for litigation costs, all in excess of $75,000 and for such other and further relief as the Court may deem just and equitable.

## COUNT IV

## COMMON LAW RETALIATORY DISCHARGE

195.    The Plaintiff hereby incorporates by reference Paragraphs 1 through 174 above as though fully set forth herein.

196.    The Plaintiff made good faith reports regarding fraud against government budgets, which violated state and federal law, and of financial and other harms committed against federal agencies, taxpayers, and those impacted by the violation of the environmental laws identified herein, and Plaintiff engaged in efforts to stop and prevent this conduct by Defendant.

197.    The Plaintiff was maliciously, willfully and wantonly targeted and constructively discharged by Defendant, in part, because of her good faith reports, and her efforts to stop or prevent fraud and violations of state and federal laws.

198.    The Plaintiff has suffered damages as a result of the malicious, willful and wanton conduct of Defendants in terminating the Plaintiff's employment in retaliation for her good faith reports, and her efforts to stop or prevent fraud and violations of state and federal laws.

WHEREFORE, Plaintiff prays for judgment against Defendants for back pay, including

wage increases and reimbursement of any lost fringe benefits, retirement plan benefits, pension

benefits, and Social Security contributions, an award of front pay, emotional pain and suffering,

mental anguish, inconvenience, and loss of enjoyment of life, punitive damages, pre-and post-

judgment interest reasonable attorneys' and expert fees, and for litigation costs, all in excess of

$75,000 and for such other and further relief as the Court may deem just and equitable.

## COUNT V

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

199.    The Plaintiff hereby incorporates by reference Paragraphs 1 through 174 above as

though fully set forth herein.

200.    The Defendant had a duty to refrain from causing severe mental distress to the

Plaintiff.

201.    The Defendant breached their duty of reasonable care.

202.    The Defendant's conduct was the proximate cause of the Plaintiff's injuries.

203.    The Defendant's conduct toward the Plaintiff was willful and wanton and was in

reckless disregard for the Plaintiff.

204.    The Plaintiff sustained damages from the Defendant's conduct.

WHEREFORE, Plaintiff prays for judgment against Defendants in excess of $75,000 for

her actual damages, pain and suffering, mental anguish, inconvenience, loss of enjoyment of life,

for punitive damages, for the costs of this action, and for such other and further relief as the

Court deems just and equitable.

Respectfully submitted,

/s/ Robert K. Collins
Robert K. Collins, #22675
Collins Law Office, LLC
P.O. Box 4786
Olathe, Kansas 66063
(913) 538-7472
robert@collinslegal.com

*Attorney for Plaintiff/Relator*

## DEMAND FOR A JURY TRIAL

Plaintiff/Relator respectfully requests that the issues in this matter be heard by a jury.

## DESIGNATION OF PLACE OF TRIAL

Plaintiff/Relator hereby designates the Federal Court in Kansas City, Kansas as the place

of trial in this matter.

/s/ Robert K. Collins
Robert K. Collins, #22675
Collins Law Office, LLC
P.O. Box 4786
Olathe, Kansas 66063
(913) 538-7472
robert@collinslegal.com