**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF KANSAS**

| | |
|---|---|
| THE UNITED STATES OF AMERICA ) | |
| *ex rel*. Michele Coffman ) | |
| ) | |
| Plaintiff-Relator ) | Case No. 2:14-cv-02538-JAR-TJJ |
| ) | |
| v. ) | |
| ) | |
| THE CITY OF LEAVENWORTH, KANSAS ) | |
| ) | |
| Defendant ) | |

## PLAINTIFF-RELATOR'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Based on a cavalcade of incomplete and immaterial facts, a core of operative facts on which the parties agree, and a few misstatements of the law, the City of Leavenworth (Defendant) has moved for summary judgment on seven separate grounds. These grounds stretch the bounds of common sense and rely on a decidedly biased view of the facts and controlling law. As set forth below, Leavenworth's arguments are inconsistent with the prevailing interpretations of the False Claims Act and the law in the Tenth Circuit.

### Plaintiffs' Response to Leavenworth's Statement of Undisputed Material Facts

1. Michele Coffman worked at the City of Leavenworth's wastewater treatment plant ("WTP") from 2010 to 2013. (Pretrial Order, Stipulated Facts ¶¶ 1, 26).

   **RESPONSE:** Undisputed

2. At all times relevant to this litigation, Charles Klingler was the superintendent at the WTP, and Michael McDonald was the city engineer and director of public works. (Pretrial Order, Stipulated Fact ¶ 2).

   **RESPONSE:** Undisputed

1

3.   The City has a National Pollutant Discharge Elimination System ("NPDES") permit for the time period from 2008 through December 2012 and a permit for the period January 2013 through 2017.  (Pretrial Order, Stipulated Fact ⁋ 17).

**RESPONSE:** Undisputed

4.   The NPDES permits allows the City to discharge treated effluent from its wastewater treatment plant into the Missouri River.  (Pretrial Order, Stipulated Fact ¶ 18).

**RESPONSE:** Undisputed

5.   The entity responsible for issuing and administering the City's NPDES permits is the Kansas Department of Health and Environment ("KDHE").  (Huismann, p. 17:6-24).

**RESPONSE:** Undisputed

## I.   The broken sewer line

6.   A "bypass" is an intentional or unintentional diversion of a waste stream from any portion of a treatment facility.  (Huismann, p. 20:12-21:2).

**RESPONSE:**  Undisputed.

7.   Under both NPDES permits, the City was required to report all bypasses to KDHE. (Huismann, p. 24:4-25:5).

**RESPONSE:** Undisputed.

8.   On or around August 25, 2010, WTP operators discovered a break in a sewer line that crosses 5-Mile Creek in front of the WTP, between manholes AAB and ABA.  (Pretrial Order, Stipulated Fact ⁋ 12; McDonald, p. 32:3-33:4; 122:9-14).

**RESPONSE:** Undisputed.

9.   WTP assistant superintendent Chad Lough reported the break to KDHE on August 25. His report stated: "Erosion caused large sections of concrete to slide down the hill and

damage [the] pipe crossing the creek." Under "Date Bypass Ended," Lough marked "N/A." (Lough Affidavit, ¶ 3).

**RESPONSE:**  Undisputed as to what the report said.

10.    In response to the break, Klingler directed operators to place an inflating plug into the pipe inlet at Manhole AAB, in an effort to stop backflow from the manhole from entering the line and escaping into the creek.  (Klingler Affidavit, ¶ 9).

**RESPONSE:**  Undisputed as to what was in Klingler's affidavit.

11.    On August 27, EPA representative Mike Boeglin called McDonald to discuss a citizen complaint about the broken line.  McDonald told him the City was aware of the break, had reported it to KDHE, and had already undertaken efforts to plug the line.  (McDonald Affidavit, ¶ 2).

**RESPONSE:** Undisputed but incomplete in that there is no record that there was any ongoing discussion between the City and EPA regarding the fact that the pipe remained broken for a lengthy period of time.

12.    On August 28, KDHE environmental scientist Vic Montgomery met with Klingler at the WTP.  Montgomery directed Klingler to discharge treated effluent from the final clarifiers into the creek to improve the creek's smell and appearance, and considered the discharge to be appropriate.  (Montgomery Affidavit, ¶¶ 2-4; Klingler Affidavit, ¶ 10; McDonald, p. 34:18-35:2)

**RESPONSE:**  Disputed.  Defendant has produced no documents anywhere substantiating this statement and Federal rules require a change in a permit to be done formally.

13.    McDonald authorized the effluent discharge after being informed KDHE indicated the discharge was permitted.  (McDonald, p. 43:19-44:5).

**RESPONSE:** Undisputed but incomplete in that there is no documentation anywhere of KDHE's having approved the City's violation of its permit.

14.  Klingler believed that because the effluent discharge was performed at KDHE's direction, it was appropriate and did not render the City out of compliance with its NPDES permit.  (Klingler Affidavit, ¶ 11).

**RESPONSE:**  Undisputed as to what was in the affidavit, but disputed as to whether such a belief was reasonable.  .

15.  Because the pipe break had been caused by erosion to the 5-Mile Creek bank, in September 2010, the City began evaluating design contracts to widen and restabilize the creek bank to protect the pipe.  (McDonald, p. 125:20-126:13).

**RESPONSE:** Undisputed.

16.  At some point after the break, the inflatable plug ruptured, and was replaced by a series of sandbags.  (Bennetts, p. 88:12-89:22).

**RESPONSE:** Undisputed.

17.  KDHE district engineer Helen Holm, who inspected the WTP for compliance with its NPDES permit in October 2010, did not consider the bypass to be a violation of the City's NPDES permit because the City notified KDHE of the problem and was attempting to mitigate the issue.  (Holm Affidavit, ¶ 8, 10).

**RESPONSE:**  Disputed.  Holm's opinion was based on incomplete facts. Her report does not address the discharge of effluent.  (Doc. 93-8 at pp 15-23

18.  On November 17, KDHE representative Chris Seeds sent Lough an e-mail asking about the status of the broken line.  Lough responded:

"The pipe that crosses the creek is damaged.  Flow from that line upstream is minimal (only one business on that service and its an asphalt production plant).  On our side of the creek there are 35-50 sand bags in place in front of the line minimizing flow back towards the creek.  This project is currently under review for repair and or replacement of the pipe that crosses the creek."

(Lough Affidavit, ¶ 4).

**RESPONSE:** Undisputed as to what was in the email.

19.   Operators were unable to successfully "camera" the broken line to determine the exact location of the break until January 25, 2011.  (Bennetts, p. 93:6-13; 100:17-101:6)

   **RESPONSE:**  Undisputed

20.   In February 2011, the City contracted with Water Resource Solutions to prepare a design study for use in the project to repair the broken line and restabilize the creek bank. (McDonald, p. 128:16-129:3).

   **RESPONSE:**   Undisputed

21.   From approximately May through October 2011, the broken sewer pipe was submerged, due to high waters from the Missouri River flood, which prevented the City from repairing the line.  (McDonald, p. 133:18-25; 136:23-137:1; Coffman, p. 86:1-5).

   **RESPONSE:**  Disputed.  McDonald acknowledged that there was no reason why the broken sewer pipe could not have been repaired in August 2010.  Exhibit 2, McDonald Deposition, at pp. 139:9-12.

22.   On June 7, 2011, Seeds asked Lough if the broken line had been repaired.  Lough responded on June 13, "This repair has not been completed.  I do believe that there are some proposals / plans available from the Engineering Dept. or Charles Klingler the WPC Superintendent."  (Lough Affidavit, ¶ 5).

**RESPONSE:**  Undisputed

23.   When flood waters receded in approximately October or November 2011, the broken line
was visibly separated from the manhole.  (McDonald, p.135:5-11; 136:23-137:10).

**RESPONSE:**  Disputed.  Coffman testified that she was involved in the work on the
broken line before the flood and she knew no additional work was done after the flood.
Exhibit 1, Coffman deposition, 237:6-10.

24.   On November 17, 2011, Linaweaver Construction capped the line by filling it with
concrete.  (Pretrial Order, Stipulated Fact ℙ 18).

**RESPONSE:**  Undisputed

25.   Following Linaweaver's repair, the broken sewer line no longer leaked.  (Coffman, p.
109:18-25).

**RESPONSE:**  Undisputed.

26.   On November 17, the City notified KDHE the bypass had ended.  (Lough Affidavit ℙ 6).

**RESPONSE:**  Undisputed

27.   Although the City could have hired a contractor to cap the line in August 2010, it elected
not do so because city officials were looking for a less costly solution while they worked
on the bigger bank restoration project.  (McDonald, p. 186:10-18; 188:15-189:2).

**RESPONSE:**  Disputed.  While McDonald testified that the City was working on the
bigger bank restoration project, bids were not taken until February 2011, long after the
sewer line broke.  McDonald deposition, 131:1-10.

28.   Both McDonald and Klingler believed the City's response to the broken sewer line
complied with its NPDES permit because the City identified the break, worked on a
solution, and kept in communication with KDHE.  (McDonald, p. 187:21-188:7; Klingler

Affidavit, ¶ 4, 12).

**RESPONSE:**  Disputed**.**  Given the email from Bob Patzwald that KDHE was "poking

around" and the City would be in "big trouble" if it did not at, the suggestion that the City

kept in communication with KDHE is suspect.  Exhibit 14, D000665.

29.     In the inspection that most immediately followed the November 17 repair, KDHE noted:

"The line to the plant from Geiger Ready Mix has been plugged and is no longer leaking

into the creek.  Wastewater from the company now collects in a manhole and is pumped

out weekly and delivered to the plant.  (Montgomery Affidavit, ₧ 5, Attachment 1).

**RESPONSE:**  Undisputed

30.     Based on KDHE's inspection report, Klingler believed KDHE was aware of the broken

line and had determined the City's response was appropriate.  (Klingler Affidavit, ₧ 12).

**RESPONSE:**  Disputed as to whether Klingler's belief on these facts was reasonable.

31.     KDHE never notified the City that its response to the broken sewer pipe violated the

City's NPDES permit.  (McDonald, p. 188:11-14).

**RESPONSE:**  Undisputed, but incomplete in that there is no record of KDHE

authorizing the discharge into Five Mile Creek.

32.     KDHE district engineer Helen Holm does not consider bypasses to be a violation of the

permit, provided that KDHE is properly notified and mitigation efforts are undertaken.

(Holm Affidavit, ₧ 6).

**RESPONSE:**  Undisputed

33.     KDHE determined that all bypasses from 2010 to 2014 were properly reported and did

not render the City out of compliance with its NPDES permit.  (Holm Affidavit, ₧₧ 5, 9,

14, 18; Montgomery Affidavit, ₧ 8).

**RESPONSE:** Undisputed that that is what Holm and Montgomery state KDHE determined

34.   Both Klingler and McDonald believed that based on the City's reports to KDHE and KDHE's responses, the City was in compliance with its permit and the law.  (Klingler Affidavit, ⁋ 4; McDonald Affidavit, ⁋ 3).

**RESPONSE:**   Undisputed as to what is in the affidavits, but disputed with regard to whether such a belief was reasonable.

35.   McDonald believed the City was required to report bypasses to KDHE, but did not believe the bypasses also needed to be reported to the Army, D.O.J., or V.A., or that bypasses were in any way relevant to those agencies' decision to pay their monthly invoice.  (McDonald Affidavit, ⁋ 4).

**RESPONSE:**   Undisputed as to what is in McDonald's affidavit, but disputed as to whether these beliefs are reasonable.

36.   Relator's expert, Scott Huismann, P.E., reviewed approximately 115 bypass reports from 2010 to 2013, including the bypass associated with the broken line crossing 5-Mile Creek.  Huismann believes each bypass violated the City's NPDES permit because (1) it constituted a "discharge" from a source other than the one authorized by the permit; (2) the contents of the discharge likely exceeded the permit content limitations; and (3) the bypass reports failed to contain necessary information.  (Huismann 30:6-32:16).

**RESPONSE:**   Undisputed

37.   Huismann also believes the discharge of effluent into 5-Mile Creek violated the permit because the discharge was from an unauthorized location. (Huismann, p. 44:24-45:8).

**RESPONSE:**   Undisputed

**II.**   **Submissions to FEMA**

38.   On September 23, 2011, the Federal Emergency Management Agency ("FEMA")

declared the 2011 Missouri River flood to be a "Major Disaster," and designated the

incident as "Kansas Flooding (DR-4035)."  (Pretrial Order, Stipulated Fact ꟼ 15).

**RESPONSE:**   Undisputed

39.   Following a natural disaster, FEMA representatives work with cities to prepare a

standardized "Project Worksheet" ("PW") document that FEMA prepares as part of a

formal request for reimbursement.  (McDonald, p. 149:1-17; 153:8-15).

**RESPONSE:**   Undisputed

40.   Kansas Department of Emergency Management ("KDEM") project specialist Les Money

acted as the liaison between the City and FEMA, and was responsible for gathering the

information compiled by FEMA for PW 90, which included a request for reimbursement

associated with debris in the bar screen building, excessive grit in the clarification

chamber building, and clogged sewer lines in approximately 20 locations.  (Money

Affidavit, ꟼꟼ 2, 3 and Attachment 1; Pretrial Order Stipulated Fact ꟼ 16).

**RESPONSE:**   Undisputed

41.   During the preliminary meetings between the City and Les Money about flood damage at

the WTP, city officials advised Money that the pipe crossing 5-Mile Creek had been

damaged prior to the 2011 Missouri River Flood.  (Money Affidavit, ꟼ 4).

**RESPONSE:**   Disputed.   McDonald's email to Montgomery regarding how the broken

pipe became damaged conflicts with this statement.  Exhibit 15, D000679-680.

42.   According to Relator, the debris in the bar screen building, grit in the clarification

chamber building, and clogged sewer lines were caused by high water flooding the inside

of the buildings through the break in the sewer pipe.  (Coffman, p. 113:10-25; 115:25-116:6; 118:10-18).

**RESPONSE:**  Undisputed but incomplete.  McDonald also testified testified that no analysis was ever performed to determine if flood waters had entered from anywhere other than the broken sewer pipe. McDonald, p. 167:5-12.

43.   On December 11, 2011 FEMA representative Thomas Montgomery sent Les Money an e-mail asking for information about the broken sewer line.  (McDonald, p. 157:2-158:7; McDonald Ex. 58).

**RESPONSE:**  Undisputed

44.   Montgomery's request was forwarded to McDonald who, on December 12, sent an e-mail outlining the history of the broken line, which stated:

> "The 10" sewerline . . . crossed Five Mile Creek in a concrete encased structure.  The creek had eroded sufficiently that the structure had become a 'waterfall.'  City staff had explored a variety of repair strategies that would have been programmed into a future [capital improvements project] program.
>
> The 2011 Flood submerged this structure and subjected it to unusual forces.  The structure became unstable and essential 'broke' at the outside of MH 4268.  This allowed substantial inflow to enter the plant, and created other operational difficulties.  Efforts to stop[] the flow from inside MH 4268 proved only marginally effective.  Once the water receded a contract as issued to Linaweaver Construction to remove the broken sewer crossing and seal the two manholes.  This work cost $7021 on PO 4478."

The e-mail also included, as an attachment, a spreadsheet with cost estimates "based on a concept developed in early 2011 as part of the [capital improvements project or "CIP"] planning."   (McDonald, p. 141:22-143:6; 146:2-19; McDonald Ex. 56).

**RESPONSE:** Disputed in part as Defendant mischaracterizes the email as "outlining the history of the broken line." The email does not outline the history of the broken sewer pipe. It makes no mention of the fact that the pipe had been broken for nearly a year before the flood even occurred.

45. City finance director Dan Williamson was the "gatekeeper" with respect to the City's claims to FEMA.  Williamson decided not to submit a claim for repairs to the broken sewer pipe because the project had been on the City's CIP list prior to the flood, and no claim was submitted. (McDonald, p. 161:8-20; 161:3-20; 171:18-172:1; Money Affidavit, ⁋ 5).

**RESPONSE:**  Undisputed

46. Coffman was not responsible for making submissions to FEMA.  (Coffman, p. 121:16-122:3).

**RESPONSE:**  Undisputed

47. Huismann has not reviewed the City's submissions to FEMA and has no opinion about whether they were proper.  (Huismann, p. 122:12-25).

**RESPONSE:**  Undisputed

**III.**   **Plant maintenance**

    **a.**   *__Trickling Filters__*

48. Standard Condition 8 to the City's 2008 NPDES permit required the City to "at all times maintain in good working order and efficiently and effectively operate all treatment, collection, control systems or facilities to achieve compliance with the terms of this permit . . . ." (Huismann, p. 16:10-24; Huismann Ex. 28).

**RESPONSE:** Undisputed.

49.    Standard Condition 6 to the 2013 permit required the City to "at all times properly

operate and maintain all facilities and systems of treatment and control (and related

appurtenances) which are installed or used by the permittee to achieve compliance with

the requirements of this permit and Kansas and Federal Law."  (Huismann, p. 16:10-24;

Huismann Ex. 28).

**RESPONSE:**  Undisputed.

50.    The WTP utilizes three large vertical towers called "trickling filters," which contain

microorganisms utilized in the wastewater treatment process.   (McDonald, p. 20:19-21;

Huismann, p. 47:5-10).

**RESPONSE:**  Undisputed, but immaterial.

51.    At some point in 2012, operators discovered that the bearings in Trickling Filters #1 and

#2 were deteriorating, which periodically caused the distributor arms to stop turning.

This, in turn, periodically caused water from inside the filters to escape through the

bottom air vent.  (McDonald, p. 20:1-18; Coffman, p. 168: 3-169:7; Bennetts 129:3-6).

**RESPONSE:**  Undisputed, but immaterial.

52.    Each time one of the trickling filters caused a bypass, the City reported it to KDHE.

(McDonald, p. 24:14-21; Coffman, p. 172:14-173:1).

**RESPONSE:**  Undisputed, but immaterial.

53.    Trickling Filter #1 was eventually taken out of service because parts necessary to repair it

were unavailable.  (McDonald, p. 21:16-22:4).

**RESPONSE:**  Undisputed, but immaterial.

54.    In response to the issues with the bearing in Tricking Filter #2, staff implemented an

aggressive maintenance schedule, which included monitoring the distributor arm to make

sure it was properly turning, and frequently changed the oil in the bearings.  (McDonald, p. 22:8-19; Coffman, p. 171:4-172:7).

**RESPONSE:**  Undisputed, but immaterial.

55.   Following implementation of the maintenance schedule in July 2013, there were no further bypasses.  (Huismann, p. 118:21-119:8; 121:6-15).

**RESPONSE:**  Undisputed for purposes of this motion, but immaterial.

56.   Holm made specific note of the issues with Trickling Filters #1 and #2 in her December 2014 inspection report, and determined that because the City had properly notified KDHE of the issues and was attempting to remedy them, the City was not in violation of Standard Condition 6 of its NPDES permit.  (Holm Affidavit, ⁋ 17).

**RESPONSE:**  Undisputed for purposes of this motion, but immaterial.

57.   McDonald and Klingler both believed that because operators took numerous steps to keep the trickling filters running and made KDHE aware of the issues, the issues with the trickling filters did not render the City out of compliance with its NPDES permit. (McDonald Affidavit, ⁋ 5; Klingler Affidavit, ⁋ 17).

**RESPONSE:**  Undisputed for purposes of this motion, but immaterial.

58.   Huismann believes that under Standard Condition 8 to the 2008 permit, and Standard Condition 6 to the 2013 permit, the City violated its permit any time any time a piece of equipment used in the treatment process malfunctioned and was unable to be rectified "within a matter of a few days."  (Huismann, p. 115:21-116:19).

**RESPONSE:**  Undisputed.

59.   According to Huismann, the City's maintenance of the trickling filters violated its permit because the City should have been aware the old bearings were deteriorating and had

replacement parts on hand.  (Huismann, p. 48:22-49:20).

**RESPONSE:** Undisputed.

60.   Huismann was unaware of any instances in which KDHE ever claimed the City's

maintenance of the trickling filters violated its NPDES permit.  (Huismann, p. 56:16-23).

**RESPONSE:** Undisputed, but immaterial.

        **b.**    ***Holding Tank Mixers***

61.   As an early part of the treatment process, wastewater passes through a large basin called a

"primary clarifier."  The heavier part, referred to as "sludge," sinks to the bottom, and is

pumped into a holding tank, before being transferred to a "belt press" where the liquid is

removed.  The liquid then goes back into the treatment process, while the sludge is

transferred to Hamm's landfill.  (McDonald, p. 25:7-26:10).

**RESPONSE:** Undisputed, but immaterial.

62.   The holding tanks are equipped with a mechanical mixer, designed to make the sludge

transferred to the belt press more consistent.  (McDonald, p. 26:21-27:4).

**RESPONSE:** Undisputed, but immaterial.

63.   At some point, the sludge mixers began experiencing mechanical issues.  (McDonald, p.

27:5-14; Coffman, p. 173:25-174:18).

**RESPONSE:** Undisputed.

64.   Without operational mixers, the heavier parts of the sludge sat at the bottom of the

holding tank, while the lighter parts remained at the top, instead of being mixed together.

Consequently, sludge being processed by the belt press was inconsistent—sometimes

thick and sometimes thin and watery.  (McDonald, p. 30:20-31:3).

**RESPONSE:** Undisputed.

65.   The broken mixers had no effect on the City's compliance with the effluent discharge parameters of its NPDES permit.  (McDonald, p. 29:20-30:1).

**RESPONSE:**  Undisputed for purposes of this motion, but immaterial.

66.   City officials notified KDHE that the mechanical sludge tank mixers were not operational during inspections on March 18, 2010, April 4, 2012, and October 5, 2012.  (Holm Affidavit ℙℙ 4, 13; Montgomery Affidavit, ℙ 6).

**RESPONSE:**  Undisputed for purposes of this motion, but immaterial.

67.   Neither Holm nor Montgomery considered the inoperational mixers to be a violation of the City's NPDES permit.  (Holm Affidavit, ℙℙ 4, 13; Montgomery Affidavit, ℙ 6).

**RESPONSE:**  Undisputed for purposes of this motion, but immaterial.

68.   Neither McDonald nor Klingler believed the issue with the holding tank mixers had any bearing on the City's compliance with the standard conditions of its NPDES permits.  (Klingler Affidavit, ℙ 15; McDonald Affidavit, ℙ 7).

**RESPONSE:**  Undisputed for purposes of this motion, but immaterial.

69.   At some point after October 2013, the City replaced the mechanical mixers with an air bubbling system.  (McDonald, p. 27:5-21).

**RESPONSE:**  Undisputed, but immaterial.

70.   According to Huismann, the City's failure to promptly repair or replace the mixers constituted a violation of Standard Condition 8 to the 2008 permit or Standard Condition 6 to the 2013 permit.  (Huismann, p. 116:20-117:1).

**RESPONSE:**  Undisputed.

71.   Huismann agreed the City's NPDES permits did not require the City to have a sludge tank mixer, and is unaware of any instance in which the City exceeded the discharge

limitations of its NPDES permit because the mixers in the sludge tank were not operational. (Huismann, p. 62:24-63:4; 64:8-11).

**RESPONSE:** Undisputed.

### IV. The Vactor truck

72. The City owns a large industrial truck, referred to as a "Vactor" truck, equipped with a high-pressure water jet cleaning system, as well as a vacuum system for clearing out objects. (McDonald, p. 56:14-19).

**RESPONSE:** Undisputed.

73. When the vacuum component was used, operators drained the truck's liquid contents into a manhole inside the plant for processing. (McDonald, p. 57:8-17).

**RESPONSE:** Disputed. The truck drained some, but not all, of its liquid contents into the WTP. Statement of Facts in Plaintiff-Relator's Motion for Partial Summary Judgment, Docket no. 95 ("SOF"), ¶¶ 50-51.

74. From approximately 2007 to some point in 2012, operators deposited the solids and whatever liquid remained in the Vactor into an operator-dug trench in one of two areas behind the gates of the WTP. (McDonald, p. 57:18-58:16; 61:23-62:3; Bennetts, p. 132:12-133:21).

**RESPONSE:** Disputed. Operators dumped the contents on the ground during the relevant period, not into a trench. SOF ¶ 49.

75. "Solids" from the Vactor truck typically consisted of items such as personal hygiene products, plastic razors, gravel, and rocks. (McDonald, p. 73:8-23; Bennetts, p. 131:1-5).

**RESPONSE:** Disputed as incomplete and misleading. The material dumped included such items, but also included raw septage. SOF ¶ 51.

76.   Klingler believed the contents of the Vactor truck were "grit and screenings," which are exempt from 40 C.F.R. Part 503 regulations, and were being disposed of appropriately. (Klingler Affidavit, ¶¶ 5-7).

**RESPONSE:** Plaintiff objects to this statement as legal argument. To the extent this statement asserts facts, Plaintiff disputes it. No evidence exists that any City personnel considered the material dumped from the Vactor truck to be "grit and screenings" before the City retained an expert witness in this case.

77.   At some point, operator Kris Bennetts called KDHE with concerns about the procedure. Bennetts's perception of KDHE's response was that the procedure he described was no "big deal," which, to him, was "an affirmation of this is not as big as what I'm thinking it is." (Bennetts, p. 140:6-17).

**RESPONSE:** Undisputed.

78.   KDHE inspector Vic Montgomery performed a plant inspection on April 4, 2012, during which he observed operators dump the contents of the Vactor truck on the ground, before being removed.  In his inspection report, Montgomery noted: "Vac trucks are dewater[ed] then the septage is dumped on the ground to be processed, please make sure to check that water does not migrate from the area."  In a letter accompanying the report, Montgomery clarified, "Solids [from the Vactor truck] are being collected and handled properly but please make sure any excess water does not migrate from the site."  (Montgomery Affidavit, ¶¶ 5,7).

**RESPONSE:** Disputed. KDHE personnel performed a plant inspection on April 4, 2012, but did not inspect the area where the Vactor truck dumped and did not observe operators dump the Vactor truck, as no dumping occurred on the day of the inspection.

79.   McDonald first learned about the operators' practice of depositing the solids from the

Vactor truck on the ground around the time he reviewed KDHE's 2012 inspection report.

(McDonald, p. 40:19-41:12).

**RESPONSE:** Undisputed.

80.   Based on the KDHE report, McDonald believe the City's practice complied with

applicable regulations.  Nonetheless, he directed Klingler to find another way to dispose

of the Vactor truck solids, because he felt that dumping the contents on the ground looked

unseemly.  (McDonald, p. 40:13-20; 74:25-75:11).

**RESPONSE:**  Undisputed that McDonald directed Klingler to find another way to

dispose of solids. Disputed that McDonald believed the City's practice complied with

applicable regulations. SOF ¶ 58.

81.   Following McDonald's directions, operators continued to dewater the truck, but placed

the solids in a dumpster to dry, before being hauled away to the landfill.  (McDonald, p.

59:10-60:4).

**RESPONSE:**  Disputed. On-site dumping of material from the Vactor truck continued

through 2013. SOF ¶ 49.

82.   McDonald never reported the practice of depositing the Vactor truck solids on the ground

to the Army, the V.A., or the D.O.J., because he believed it was an operational issue, and

not the type of matter the City was required to report to its sewage customers.

(McDonald, p. 70:15-71:4).

**RESPONSE:**  Undisputed that McDonald testified as described, but immaterial what

McDonald believed, reported, or did not report, because McDonald did not participate in

day-to-day operation of the WTP.

83.   During the preliminary treatment process, wastewater passes through a large grate, referred to as a bar screen, which is designed to catch large items such as plastics or rags. These items, referred to as "screenings," are then typically placed into a bin to try, before being sent to a landfill.  (Huismann, p. 93:2-19; 94:17-22).

**RESPONSE:** Undisputed.

84.   Huismann has expressed the opinion that the contents of the Vactor truck were "sewage sludge," which, under 40 C.F.R. Part 503, was allowed to be dumped on the ground for up to two years without restriction or control.  (Huismann, p. 97:17-98:6; 99:5-8).

**RESPONSE:** Undisputed.

85.   Although Huismann did not visit the site where the Vactor truck solids were allegedly dumped, he believes some of the material deposited on the ground may still remain there, in violation of 40 C.F.R. Part 503.  (Huismann, p. 86:8-12; 87:21-88:11).

**RESPONSE:** Undisputed.

86.   Huismann admitted the distinction between preliminary treatment and removal of the Vactor truck solids was confusing and unclear, and could lead an operator to mistakenly equating the two.  (Huismann, p. 91:5-92:4).

**RESPONSE:** Undisputed.

**V.     Relator's Employment**

87.   On August 16, 2012, Coffman was promoted to assistant superintendent.  (Pretrial Order, Stipulated Fact ¶ 6).

**RESPONSE**:  Uncontroverted.

88.   When Coffman's predecessor, Chad Lough, was appointed assistant superintendent, Bennetts told him he had not been interested the position because Klingler was

impossible to get along with. (Bennetts, p. 23:16-24).

**RESPONSE**:  Uncontroverted.

89.    Bennetts believed the two prior assistant superintendents, Mark Jortgenson and Chad

Lough, left because of Klingler's management style.  (Bennetts, p. 20:11-21:6).

**RESPONSE**:  Uncontroverted.

90.    When Coffman was promoted to assistant superintendent, Klingler became her direct

supervisor.  (McDonald, p. 93:4-9).

**RESPONSE**:  Uncontroverted.

91.    At the time of her promotion, Coffman was aware she was required to pass her KDHE

Class IV certification exam within twelve months, and that her failure to do so would

result in demotion or termination.  (Coffman, p. 158:8-159:4).

**RESPONSE**:  Uncontroverted, but incomplete.  In her testimony, Ms. Coffman indicated

that she understood she would need to pass her Class IV certification within 12 months,

but she did not understand that her workload would increase dramatically or that she

would be the target of retaliation.  See Exhibit 1, Coffman deposition: 159:1-4.

92.    During the period in question, KDHE's Class IV certification exam had a pass rate of

approximately 33 percent.  (Coffman, p. 241:15-24).

**RESPONSE**:  Uncontroverted.

93.    From approximately February 2012 to February 2013, Coffman served as the City's

"project representative" for construction of a UV building at the WTP.  (Coffman, p.

155:10-156:8; McDonald, p. 90:15-25).

**RESPONSE**:  Uncontroverted.

94.     Near the end of 2012 or beginning of 2013, the UV building project was completed, and

Coffman began acting as full-time assistant superintendent.  (Coffman, p. 156:15-157:5).

**RESPONSE**:  Uncontroverted.


95.     In early January 2013, Bennetts discovered that the hydrogen sulfide ("H2S") alarm in

the belt press room was malfunctioning.  (Bennetts, p. 157:13-160:9).

**RESPONSE**:  Uncontroverted.

96.     After the issue was discovered, operators were required to use hand-held H2S alarms to

alert them of H2S gas.  (Bennetts, p. 160:10-20; Coffman, p. 177:4-11).

**RESPONSE**:  Uncontroverted.

97.     Coffman was assigned the task of getting the H2S alarm system fixed, which she fully

completed by July 2013.  (Coffman, p. 177:15-178:8; 223:1-225:3).

**RESPONSE**:  Uncontroverted, but misleading.  Ms. Coffman indicated that Klinger was

creating problems with getting the alarms fixed, although she was ultimately successful

in completing the task.  Exhibit 1, Coffman deposition; 178:2-3.

98.     Neither McDonald nor Klingler believed the issue with H2S alarm had any bearing on the

City's compliance with the standard conditions of its NPDES permit.  (Klingler Affidavit,

¶ 15; McDonald Affidavit, ¶ 7).

**RESPONSE**:  Uncontroverted.


99.     KDHE district engineer Helen Holm indicated that she would not consider the

malfunctioning H2S alarm system to be a permit violation.  (Holm Affidavit, ¶ 20).

**RESPONSE**:  Uncontroverted.

100.    According to Huismann, the malfunction with the H2S alarm constituted a violation of

Standard Condition 6 to the City's 2013 NPDES permit.  (Huismann, p. 116:20-117:3).

**RESPONSE**:  Uncontroverted.

101.    Huismann agreed that the City's NPDES permit does not require the City to have an H2S

alarm, and agreed that the malfunction had no effect on the City's effluent discharge.

(Huismann, p. 63:20-25; 64:21-65:1).

**RESPONSE**:  Uncontroverted.

102.    In March 2013, Coffman began searching for a purchase order associated with the bank

restoration project for 5-Mile Creek.  She attempted to search the sewer database for the

purchase order associated with the project, but could not find it.  (Coffman, p. 139:19-

140:1).

**RESPONSE**:  Uncontroverted.

103.    In March 2013, Bennetts resigned, citing unfair treatment by Klingler.  (Bennetts, p.

168:15-169:11).

**RESPONSE**:  Uncontroverted.

104.    Following his resignation, Bennetts presented city manager Scott Miller with a memo

outlining his perceived issues with the plant and Klingler.  (Bennetts, p. 167:5-168:8).

**RESPONSE**:  Uncontroverted but immaterial and unnecessarily argumentative in its use

of the language "perceived issues."  Mr. Bennetts testified that he wrote a memorandum

for Scott Miller explaining how Klingler had mistreated him.

22

105.   Miller reached out to Coffman, informed her of Bennetts's complaints, and asked her to come in for an interview.  Coffman met with Miller on March 26, 2013.  During the meeting, she allegedly told Miller, among other things, she was concerned the City may have submitted a claim to FEMA for the broken pipe, based on hearsay relayed to her by the other operators and her inability to locate the purchase order.  (Coffman, pp. 165:13-166:16; 174:22- 175:20).

**RESPONSE**:  Uncontroverted, but incomplete, unnecessarily argumentative in its use of the word "allegedly" and misleading.  Ms. Coffman did not equivocate in her recollection that during her meeting with Miller, she reported her concerns that the City had improperly submitted claims to FEMA.  In fact, she specifically testified that they talked about the broken sewer pipe "quite extensively." Additionally, Ms. Coffman testified that she had reached the conclusion regarding possible FEMA fraud based on her inability to find the work orders, the purchase orders, and her interviews with operators, not just on conversations with other operators.  Coffman deposition: 175:7-20.

106.   Coffman does not know what, if anything, Miller and McDonald discussed following her meeting with Miller on March 26.  (Coffman, p. 207:13-19).

**RESPONSE**:  Uncontroverted, but incomplete and misleading.  Ms. Coffman testified that she believed Miller had disclosed the contents of her meeting with him to McDonald for a variety of reasons.  Coffman deposition: 207:6-12.  Coffman also testified that she knew Miller had spoken with McDonald and Klingler about their meeting because they knew things she had disclosed only to Miller.  Coffman deposition, p. 196:3-7; 205:11-19.

107.    On April 1 and 2, Miller came to the plant and interviewed other operators, who

        reiterated Bennetts's concerns about Klingler's managerial style.  (Coffman, p. 191:11-

        19; Miller Affidavit, ¶ 4).

        **RESPONSE**:  Uncontroverted, but incomplete.  Coffman testified that Miller came to the

        WWTP and interviewed operators, but she did not know what they talked about and she

        did not sit in on the interviews.  (Coffman Deposition: 191:11-196:1.

108.    Between March 26 and April 16, Coffman had no issues with Klingler.  (Coffman, p.

        190:5-191:2).

        **RESPONSE**:  Uncontroverted, but incomplete and misleading. Ms. Coffman testified

        that after Miller met with Klingler at the WWTP, he limited his interactions with her

        significantly.  Coffman: 190:13-24.

109.    On April 16, Klingler sent Coffman a memo addressing four issues at the plant during the

        prior weeks.  (Pretrial Order, Stipulated Fact ¶19; Coffman, p. 192:18-193:8; Coffman

        Ex. 17).

        **RESPONSE**:  Uncontroverted.

110.    Coffman did not receive any discipline, such as a suspension or notice that the memo

        would be placed in her personnel file, as a result of the issues outlined in Klingler's

        memo, but nonetheless perceived the memo to be retaliatory because of "the way

        [Klingler] grouped everything together . . . ."  (Coffman, p. 194:18-196:22).

        **RESPONSE**:  Uncontroverted, but incomplete, and unnecessarily argumentative.  Ms.

        Coffman testified that she perceived the memorandum to be retaliatory because the issues

        raised reflected more strict scrutiny than she had experienced before, and were unrelated

        to one another. Additionally, she testified that if the issues raised really were for

"training" purposes as indicated by Klingler and McDonald, it seemed odd that so many high level managers would have been involved, and it seemed odd that the issues identified as performance shortcomings were not called to her attention at the time they occurred.  Coffman deposition, 197: 6-199:2.

111.    On April 18, McDonald met with Klingler to address concerns about his management style.  McDonald directed Klingler to focus on listening to staff, communicating his expectations clearly, and allowing staff to do their jobs.  (McDonald Affidavit, ¶8).

RESPONSE:  Uncontroverted.

112.    On April 18, Coffman sent Klingler a response, in which she disputed the concerns he raised in his April 16 memo.  (Pretrial Order, Stipulated Fact ¶ 20).

**RESPONSE**:  Uncontroverted.

113.    On April 19, Coffman met with McDonald and Klingler to discuss her response. McDonald told Coffman he had assisted Klingler in drafting the memo, and reiterated it had been sent for training.  Coffman responded that she felt the memo had been sent as retaliation for meeting with Miller, which McDonald denied.  McDonald became angry and said, "You don't like [Klingler] telling you what to do."  When Coffman asked what he meant, McDonald allegedly explained that Miller had told him Coffman believed Klinger "micromanages everything."  Coffman told McDonald she didn't think the meeting was going well and asked to speak to Miller.  McDonald yelled, "Go see Scott Miller then," and Coffman left.  (Pretrial Order, Stipulated Fact ¶ 21; Coffman, p. 201:10-205:10).

**RESPONSE**:  Uncontroverted, but misleading.  In her deposition, Coffman testified that when McDonald became angry and suggested she did not like Klingler telling her what to

do, he also told her that Miller had said she reported that Klingler micromanaged her. However, Coffman specifically testified that she had not made that particular complaint. Coffman deposition: 203:5-13

114.   According to Coffman, she asked Miller if he had disclosed their conversation, and he told her he had not.  (Coffman, p. 205:11-19).

**RESPONSE**:  Uncontroverted.

115.   Coffman's conversation with Miller on April 19 was her last discussion with Miller during her tenure as a city employee.  (Coffman, p. 225:14-23).

**RESPONSE**:  Uncontroverted.

116.   The following Monday, Coffman began receiving weekly "To Do" lists from Klingler, which contained tasks to be completed in addition to everyday operations.  (Coffman, p. 215:19-24).

**RESPONSE**:  Uncontroverted.

117.   Although the items on the "To Do" lists fell within the scope of Coffman's job duties, she perceived Klingler to be improperly shifting his own responsibilities onto her.  (Coffman, p. 217:5-22).

**RESPONSE**:  Uncontroverted, but unnecessarily argumentative.  Ms. Coffman testified that after she met with Miller and complained about various things in her workplace, her workload dramatically increased, and Klingler began giving her lists of chores to do, but he never followed up with her on the duties. He was no longer present at the WWTP and essentially did no work after that time, and left her doing all the work herself. Coffman: 217:12-14.  218-220:2:

118.   According to Coffman, Klingler's additional assignments caused her to work long hours,

while Klingler would come in late and leave early.  (Coffman, p. 219:4-220:11).

**RESPONSE**:  Uncontroverted, but unnecessarily argumentative.  Ms. Coffman testified that because Klingler had essentially abdicated his role as superintendent, she was left with no help at all. Exhibit 1, Coffman deposition: 219:4-7.

119.   Coffman failed the KDHE Class IV certification exam in December 2012 and on May 9, 2013.  (Coffman, p. 160:19-161:10; 244:10-245:7).

**RESPONSE**:  Uncontroverted.

120.   On June 12, Coffman met with Klingler and Lanter to discuss what would happen if she failed to pass her Class IV test.  Lanter suggested Coffman also take the Class III test as a "fall back," but Coffman rebuffed the idea, complaining that due to her increased workload, she had no time to study.  As a result of the meeting, the City agreed to extend Coffman's deadline from August 16 to August 29, which would allow her to take a test scheduled for the 29th if necessary.  (Coffman, pp. 221:12-222:3; 247:13-22).

**RESPONSE**:  Uncontroverted, but incomplete.  During the meetings with Lanter and Klingler to discuss the consequences of not passing the various tests, Ms. Coffman consistently reported retaliation and explained that her increased workload, which was filled with meaningless tasks meant to distract her from studying, made it impossible for her to study for either the Operator IV or III tests.  Exhibit 1, Coffman deposition, 221: 4-222:3.

121.   Coffman again failed the KDHE Class IV certification exam on August 2, 2013.  (Coffman, p. 244:10-245:7).

**RESPONSE**:  Uncontroverted.

122.   On August 8, Coffman asked Klingler to extend her deadline to pass the Class IV

certification exam from 12 months to 18 months.  Coffman deposition, p. 241:11-14).

**RESPONSE**:  Uncontroverted, but incomplete.  In her August 8 communication to Klingler, Ms. Coffman again reiterated that her request for the extension of time was tied to the retaliation she had experienced.  See exhibit __, D000586

123.   On August 16, Klingler notified Coffman he had already extended the deadline, and that her request for an additional six-month extension was denied.  (Coffman, p. 247:9-248:1).

**RESPONSE**:  Uncontroverted

124.   On August 16, Klingler also presented Coffman with her first performance evaluation as assistant superintendent.  On a scale from 0 (lowest) to 2 (highest), Klingler rated Coffman's performance as a "1," defined to mean "[a] totally competent employee," "[a] good steady contributor," and "[a]n employee that completes all stated job requirements in a timely an efficient manner" on each of the ten categories of review.  (Coffman, p. 212:5-213:5; Coffman Ex. 20).

**RESPONSE**:  Uncontroverted, but incomplete.  In her testimony, Ms. Coffman explained that the ratings in question were noticeably lower than her previous ratings, and were, in fact, the lowest ratings of any operator at the plant. She felt that the Klingler's performance review was very "basic" meaning that he did not put any effort into it, which was different than what he had done previously on her ratings.  Coffman Deposition: 213:10-16; 214:17-25.

125.   Based on her evaluation, Coffman received a two percent raise, the highest performance-based raise during her tenure with the City.  (Lona Lanter 7:6-8; D462).

**RESPONSE**:  Uncontroverted.

126.   On August 18, Coffman informed Klingler she wanted to grieve his decision to deny her

request for the extension, as well as her performance evaluation.  (Michele Coffman 248:4-9; Coffman Depo. Ex. 23).

**RESPONSE**:  Uncontroverted.

127.  On August 19, Klingler denied Coffman's grievances.  Coffman eventually appealed the decision to H.R. director Lona Lanter, who informed her that (1) performance evaluations were not grievable, and (2) the decision to deny her request for an extension was being upheld.  (Coffman, p. 248:13-250:22; Coffman Ex. 23).

**RESPONSE**:  Uncontroverted.

128.  No other WTP operator has been granted an extension of the deadline to pass the KDHE Class IV operator exam.  (Lanter, p. 10:18-11:6).

**RESPONSE**:  Uncontroverted, but misleading.  Ms. Coffman specifically testified that two other operators would have been given an extension of time in which to pass their exams if they had not already taken the tests three times in one year, which would mean the extension would not have done them any good.  Her situation was different, in that there was another testing date offered within the one year window.  Coffman: 251:1-23.

129.  No WTP operator has been granted a six-month extension of the deadline to pass any KDHE certification exam.  (Lanter, p. 20:3-8).

**RESPONSE**:  Uncontroverted, but misleading. See response to 128.

130.  According to Coffman, after former operators Steve Garcia and Tom Schellhorn failed their Class I exams, the City considered extending the deadline for operators to pass their Class I certification exam from 18 months to 24 months.  However, because both employees had already failed the exam three times within the past 18 months, KDHE would not have allowed them to take the test again during the proposed six-month

extension period. Accordingly, the City terminated both employees. (Coffman, p. 250:4-252:3; 295:15-296:5).

**RESPONSE**: Uncontroverted, but incomplete. The City would have granted extensions to those individuals, but for the timing issue, which was not present in her case. See D 003028, listing dates for exam within the window of extension Plaintiff requested.

131. On September 3, 2013, KDHE notified the City and Coffman that she had failed the August 29 Class IV certification exam. (Coffman, p. 243:7-13).

    **RESPONSE**: Uncontroverted.

132. On September 12, 2013, the City notified Coffman she had been demoted to Operator II for failing to pass her KDHE Class IV certification exam within twelve months. (Coffman, p. 252:9-253:7).

    **RESPONSE**: Uncontroverted.

133. Coffman submitted her letter of resignation on October 4, 2013. (Coffman, p. 254:24-255:3).

    **RESPONSE**: Uncontroverted.

134. City manager Scott Miller was not involved in any of the employment decisions involving Coffman in 2013. (Miller Affidavit, ¶ 6).

    RESPONSE: Controverted. Ms. Coffman testified that McDonald knew things she had told Miller in confidence. Thus, she drew a reasonable inference that Miller had "poisoned the well" against her with McDonald. Coffman deposition: 196:3-7.

135. Miller never told McDonald, Klingler, Lanter, or any other City employee that Coffman had claimed to him that the City made a fraudulent submission to FEMA. (Miller Affidavit, ¶ 5).

RESPONSE:  Controverted.  See response to 134.

136.   Prior to this lawsuit being filed, neither Klingler, McDonald, nor Lanter were aware

Coffman claimed the City had made an improper submission to FEMA, or that she

claimed to have disclosed that concern to Miller in March 2013. (McDonald, p. 94:17-22;

Klingler Affidavit ¶ 20; Lanter Affidavit ¶ 2).

RESPONSE:  Controverted. See response to 134.

137.   In November 2013, EPA inspected the WTP and subsequently issued the City a notice of

potential violation ("NOPV") of its NPDES permit.  (McDonald, p. 179:13-180:4).

**RESPONSE**:  Uncontroverted.

138.   As a result of EPA's NOPV, the City entered into a consent order in 2015, by which the

City agreed to pay an administrative penalty and complete a special environmental

project related to its storm sewer system, but neither agreed to nor admitted any violation

of its NPDES permit.  (McDonald, p. 182:16-183:14; 189:18-23).

**RESPONSE**:  Uncontroverted.

**VI.   Facts relevant to federal billing**

139.   Ruby Maline is the City of Leavenworth's finance director.  (Maline, p. 7:24-25).

**RESPONSE:**  Undisputed.

140.   Effective July 1, 1995, the City renewed its 1974 contract with the U.S. Army (hereafter,

"the Army"), for the provision of sewage service, which is still in effect.  (Maline, p.

5:17-6:5; McDonald, p. 109:19-24; Maline Ex. 31, D404).

**RESPONSE:**  Undisputed.

141.   The "Sewage Service Specifications" section of the contract states:

"SERVICE TO BE RENDERED.  The [City] shall furnish a sanitary sewer connection and sanitary sewage service as required by the Government and shall receive, carry, treat, and dispose of all sanitary sewage originating at the project in such amounts as the Government desires to release into Contractor's sewer system and in a manner and by such means as will constitute no hazard to the public health.  The [City] shall operate [its] sewage disposal and treatment facilities in conformity with applicable laws, rules, and regulations promulgated by Federal, state and local authorities."

(Maline Ex. 31, D417).

**RESPONSE:**  Undisputed.

142.   Each month from at least 2008 to present, the City has sent the Army an invoice for sewage service.  The amount billed is based on three components: (a) annual operating and maintenance expenses; (b) overhead; and (c) reserves for repair and replacement. (Maline Affidavit ⁋ 2).

**RESPONSE:**  Undisputed.

143.   The "annual operating and maintenance expenses" component has three sub-parts: (1) the total budget for operating the treatment plant for the current year, multiplied by the Army's percentage of plant flow; (2) the total budget for operating the collection system for the current year, multiplied by a percentage specified by the contract; and (3) adjustments to account for the difference between the Army's share of the prior year's budget and the actual amount spent during the prior year to operate the treatment plant and collection system, which is then prorated over 12 months.  (Maline Affidavit, ⁋ 3).

**RESPONSE:**  Undisputed, but immaterial.

144.   Because the Army receives a credit for any amount budgeted but not spent, the City does not retain money from the Army that is budgeted for the operation of the treatment plant or collection system, but not spent.  (Maline Affidavit, ⁋ 7).

**RESPONSE:**  Undisputed, but immaterial.

145.   The "overhead" component of the bill is calculated, pursuant to the contract, at 13 percent

of the Army's annual charge for budgeted treatment plant and collection system

expenses, subject to the same adjustment to account for the difference between budgeted

and actual costs for the prior year, and then prorated over 12 months.  (Maline Affidavit,

P 10).

**RESPONSE:**  Undisputed, but immaterial.

146.   The "reserves for repair and replacement" component is calculated at 21 percent of the

replacement value of the treatment plant, divided by a projected useful life of 25 years

and then prorated over 12 months.  (Maline Affidavit, P 11).

**RESPONSE:**  Undisputed, but immaterial.

147.   On August 1, 1978, the City entered into a contract with the Veterans Administration

Center (hereafter, the "V.A."), which is still in effect today, whereby the City agreed to

provide the V.A. with sewage services.  (Maline, p. 10:7-24; McDonald, p. 111:3-5;

Maline Ex. 32).

**RESPONSE:**  Undisputed.

148.   An addendum to the V.A. contract states that the City agrees to comply with Section 308

of the Federal Water Pollution Control Act (33 U.S.C. 1251 *et seq.*) "relating to

inspection, monitoring, entry, reports, and information, as well as other requirements

specified in  . . . section 308 of . . . the Water Act . . . and all regulations and guidelines

issued thereunder before the award of this contract."  However, the section is preceded by

the following language:

> "(Applicable only if the contract exceeds $100,000 or the contracting
> officer has determined that orders under an indefinite quantity contract in

any one year will exceed $100,000, or a facility to be used has been subject of a conviction under the Clean Air Act (42 U.S. 1857c-8(c)(1) or the Federal Water Pollution Control Act (33 U.S.C. 1319(c)) and is listed by the EPA, or the contract is not otherwise exempt.)"

(Maline Ex. 32).

**RESPONSE:** Undisputed.

149.  On November 15, 1974, the City entered into a contract with the Department of Justice, Bureau of Prisons (the "D.O.J."), which is still in effect today, whereby the City agreed to provide the D.O.J. with sewage services.  (Maline, p. 11:4-23; Maline Ex. 33).

**RESPONSE:** Undisputed.

150.  The V.A. and D.O.J.'s monthly bills are calculated as a percentage of the total actual operating expenses, derived from each entity's flow readings.  (Maline Affidavit, ℙ 13).

**RESPONSE:** Undisputed, but immaterial.

151.  Coffman was not responsible for billing the federal agencies for sewage service, or for ensuring the city complied with its federal contracts.  (Coffman, p. 286:17-287:9).

**RESPONSE:** Undisputed, but immaterial.

152.  Although Klingler was aware the City had contracts with the federal agencies, he was unaware of the specific provisions of those contracts and was not responsible for ensuring the City was in compliance with the contracts.  (Klingler Affidavit, ℙ 13).

**RESPONSE:** Disputed that Klingler was not responsible for ensuring contract compliance. Klinger was the superintendent of the WTP and had responsibility for all WTP operations. **CITE.**

153.  Each month from 2008 to present, the Army, V.A., and D.O.J. has paid its monthly sewage bill in full.  At no time from 2008 to present have any of the federal agencies declined to pay the full amount billed.  (Maline Affidavit, ℙ 18).

**RESPONSE:** Undisputed that the Army, the VA, and DOJ have paid monthly invoices. Undisputed, but immaterial, that those agencies did not decline to pay, because the City did not inform the Army, the VA, or DOJ that the City was not complying with contract provisions. See Statement 82 above.

154.    At no point from 2010 to 2014 has the Army, V.A., or D.O.J. ever requested or actually performed an audit of the WTP to ensure the WTP is operating in conformity with its NPDES permit.  (McDonald Affidavit, ₱ 10).

**RESPONSE:** Undisputed, but immaterial.

## **Plaintiff-Relator's Statement of Additional Material Facts**

1.    When Michele Coffman began working for the City of Leavenworth, Charlie Klingler gave her special treatment.  She earned the nickname "Princess" because of "the way Charlie treated her versus everybody else."  Exhibit 5, Bennetts Deposition, 174:23-25; Smith Deposition, 47: 10-14, 49: 15-18.

2.    Initially, Charlie Klingler gave Michele special privileges, including exempting her from carrying on "on call" pager and sending her to training.  Exhibit 5, Bennetts Deposition, 174:21-175:12, Smith Deposition, 48:1-2, 17-21.

3.    Charlie Klingler did not like it when Michele had Kris Bennetts working with her to fix things around the plant and he retaliated against Mr. Bennetts because of it.  Exhibit 5, Bennetts Deposition, 168:17-22.

4.    Klinger "hammered" Michele Coffman after she became assistant superintendent and attempted to bring the plant into compliance with its contractual obligations in terms of maintenance of the plant.  Exhibit 6, Shellhorn declaration.

5. Coffman reported her concerns about retaliation to McDonald, but he did not know if he had asked her about the basis for her concerns. Exhibit 2, McDonald Deposition 103:19-104:1.

6. After Michele Coffman met with Klingler and McDonald, Klingler started giving her lists of things to do, but then he would ignore her when she told him she finished the tasks.  It was "like the stuff he gave [her] he didn't even really need."  Coffman deposition, 216: 5-217:4.

7. If Charlie Klingler did not like someone, he would overload them with work to prevent them from having enough time to study for their operator's tests. He wanted them to fail their tests so he could get rid of them.  Exhibit 4, Smith declaration.

8. Coffman's work situation caused significant stress, which manifested itself in chest pain, and caused her to visit the emergency department.  Exhibit 7, Medical records, D002361-2364.

9. Coffman began a new prescription for Celexa because of stress at work.  Exhibit 7, D002363.

10. Coffman sought and underwent regular counseling as a result of stress in her workplace. Exhibit 7, D2395.

11. On October 4, 2013, Coffman submitted a resignation letter explaining that she had been forced to resign because she could no longer endure retaliation from management relating to her inquiries into possible FEMA fraud and her participation in an investigation into serious safety violations at the Wastewater Treatment Plant.  Exhibit 8, D000466.

12. On April 19, 2013, Plaintiff had a meeting with McDonald and Klingler about her work. During that meeting, she became aware that some of the issues she had discussed during

her previous meeting with Scott Miller had been shared with McDonald and Klingler. Exhibit 1, Coffman deposition: 196: 3-7.

13. After Plaintiff's initial complaint came out from under seal, both local and national media picked up the story.  The Washington Times published a story on April 25, 2015, the Topeka Journal Capital published a story on April 28, 2015, and the Leavenworth Times interviewed Scott Miller in connection with the article it published on April 30, 3015. (See Exhibits 9, news articles).

14. On September 11, 2015, after becoming aware of Plaintiff's False Claims Act claim, management at the WWTP revised a document in order to put itself in a better light for the litigation.  Exhibit 10, D00728-729.

15. Ruby Maline, the City's designated witness for finance and billing, testified that while she was familiar with federal contracts at issue, her familiarity began and ended with an analysis of whether the invoices were consistent with the contractual obligations.  Exhibit 11, p. 6:11-13.

## Argument

## I.      The City Is Not Entitled To Summary Judgment Related to Environmental Fraud.

Attempting to minimize and marginalize Plaintiff's FCA environmental claim, Defendant argues that the requirement in the federal contracts that it comply with environmental laws is mere "boilerplate," as if the federal government is unserious about compliance with federal law. The City also spills a considerable amount of ink describing and justifying its operation of trickling filters and sludge holding tanks, when that equipment is only marginally relevant to Plaintiff's claims.

Plaintiff's FCA claim is simpler and more direct than Defendant's description implies, and it is based in fraud, not mere breach of contract or regulatory noncompliance. Plaintiff asserts a claim based on implied certification of compliance with contract provisions, as recognized by the Supreme Court in *Universal Health Services, Inc. v. United States and Massachusetts ex rel. Escobar*, 136 S.Ct. 1989 (2016). Plaintiff's claim is based on specific representations the City made to the government, combined with critical, material omissions concerning the City's knowing noncompliance with federal environmental laws.

### A.  The Basis of Plaintiff's FCA Claim: Implied Certification.

Defendant goes to length to describe Plaintiff's environmental fraud claim in a confusing and misleading way and to suggest it does not meet the standard for implied certification claims the Supreme Court set forth in *Escobar*. To the contrary, Plaintiff's claim neatly fits the implied certification framework described in *Escobar* and by the Tenth Circuit in *United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163 (10th Cir. 2010), in which the court of appeals reversed the district court's dismissal of FCA implied-certification claim based on improper disposal of hazardous waste.

In *Escobar*, the Supreme Court recognized the implied certification basis of FCA liability and held that it can be satisfied if (1) the claim "makes specific representations about the good or services provided" and (2) the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." *Universal Health Services, Inc. v. United States and Massachusetts ex rel. Escobar*, 136 S.Ct. at 2001. Even before *Escobar*, the Tenth Circuit had recognized implied certification as a basis of FCA liability, including in the context of environmental violations in which the defendant contracted with a federal agency for waste disposal. *Lemmon v. Envirocare of Utah,*

*Inc.*, 614 F.3d 1168-69; *United States ex rel. Conner v. Salina Regional Health Center*, 543 F.3d 1211, 1218 (10th Cit. 2008); *Shaw v. AAA Engineering & Drafting, Inc.*, 213 F.3d 519, 532-33 (10th Cir. 2000) (monthly invoices implied certification with contractual requirements); *see also United States ex. rel. Pickens v. Kanawaha River Towing,* 916 F. Supp. 702, 706 (S.D. Ohio 1996), *aff'd* 194 F.3d 1314 (6th Cir. 1999) (demand for payment is implied representation of continuing adherence to contract and establishes false claim); *United States ex. rel. Fallon v. Accudyne Corp.,* 921 F. Supp. 611, 627 (W.D. Wis 1995) (The False Claims Act creates a cause of action where a contractor knowingly fails to satisfy the environmental compliance requirements of a government contract but seeks payment as if it has fully performed without disclosing the noncompliance).

Plaintiff's FCA claim neatly fits this framework and satisfies the two-part test set forth in *Escobar* for implied certification claims. First, as the City sets forth in its Statement of Facts, the City made specific representations in its invoices to the federal agencies. It submitted invoices to the federal agencies containing information about its treatment of wastewater, including information about plant maintenance and wastewater flow amounts. DSOF 142-150. And second, the City failed to disclose that its wastewater treatment and disposal practices violated federal environmental laws.

Put simply, the City contracted with federal agencies to treat wastewater in compliance with the Clean Water Act and other environmental laws, then failed to comply with environmental laws in several specific ways, but nevertheless invoiced the federal agencies for treating certain quantities of wastewater, with no mention that it was not doing so in compliance with the law. In particular, the City failed to mention that it was discharging both raw sewage and treated effluent into Five Mile Creek, even though it had no permit to discharge anything

into Five Mile Creek and either knew or should have known that those discharges plainly violated the Clean Water Act. The City also failed to mention, as EPA found, that it violated its NPDES permit by maintaining its facilities in such a manner that discharges of pollution to waters of the United States were inevitable, and in fact occurred on at least 19 occasions.[1]

In *Escobar*, the Supreme Court held that because the defendant used payment codes "without disclosing its many violations of basic staff and licensing requirements for mental health facilities," the defendant's "claims constituted misrepresentations." *Universal Health Services, Inc. v. United States and Massachusetts ex rel. Escobar*, 136 S.Ct. at 2000-01. The fraudulent conduct here is virtually the same: the City submitted invoices with specific information about the City's services, but with no mention of violations of federal law related to the services. In these circumstances, the Supreme Court concluded that the defendant's conduct violated the FCA. Here, too, the City violated the FCA and is not entitled to summary judgment.

Defendant describes Plaintiff's claim in a confusing and misleading way, so let us be clear about what Plaintiff's claim is not: First, it is not a claim about poor trickling filter maintenance or ineffective operation of sludge holding tanks. Plaintiff's claim arises from the City's fraudulent requests for and receipt of payment to treat wastewater in compliance with the Clean Water Act, while withholding information about its unpermitted discharges and its illegal dumping of sewage.

Second, Plaintiff's claim is not a mere claim for breach of contract or mere regulatory noncompliance. The City argues that simple claims arising from contract breaches or regulatory noncompliance do not rise to the level of a FCA claim. Plaintiff's claim, however, is based not merely on the City's breaches of its federal contracts or its regulatory noncompliance, but on the

---

[1] Defendant's environmental violations are set forth in greater detail in Plaintiff-Relator's Memorandum in Support of Her Motion for Partial Summary Judgment, Docket no. 95, pp. 18-26.

City's monthly claims for payment for compliant treatment of wastewater, while withholding critical information about its contract breaches and regulatory noncompliance, resulting in the government's being billed for services it was not receiving.

And third, Plaintiff's claim is not a back-door attempt at supplemental environmental regulation. The responsibility for environmental enforcement in Kansas lies with the Environmental Protection Agency and with the Kansas Department of Health and Environment, to which Clean Water Act enforcement has been delegated in the State of Kansas. Plaintiff seeks recovery here not as a penalty for environmental violation, but as compensation for Defendant's fraudulent invoices to the Army, the VA, and the Department of Justice.

In short, because the City invoiced the federal government and collected money for services, without mentioning the City's violation of federal law pertaining to those services, the City is liable under the FCA, and it is not entitled to summary judgment.

### B. The City's Environmental Noncompliance Was Material to the Government's Payments Under the Contracts.

To support liability under the FCA, a false claim made to the government must be material to the government's decisions under the contract. The statute defines "material" broadly as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(1)(A). Thus, under the plain language of the statute, liability does not depend on whether payment decisions are actually influenced by the false claim, but only on whether the type of claim has a "natural tendency to influence" or is "capable of influencing" payment decisions. *Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d at 1170 ("materiality does not require a plaintiff to show conclusively that, were it aware of the falsity, the government would not have paid," but only that "the government *may* not have paid.")

(emphasis by Tenth Circuit);  *United States ex rel. Conner v. Salina Regional Health Center*, 543 F.3d at 1219-20.

Defendant suggests that the Supreme Court in *Escobar* approved a "but for" standard as an appropriate measure of materiality, as if to require proof that a federal agency would not have paid the claim but for the critical omission in the request for payment. The defendant in *Escobar* likewise argued that materiality should be determined narrowly, based only on expressly designated conditions of payment. *Universal Health Services, Inc. v. United States and Massachusetts ex rel. Escobar*, 136 S.Ct. at 2002. Contrary to the City's suggestion, the Supreme Court rejected such a narrow reading of materiality, recognizing instead the "tendency to influence" and "capable of influencing" language of the statute. *Id.* at 2002-03. It held that materiality should be determined not based on whether express conditions of payment exist, but on the significance of the false claim. *Id.* Thus, while insubstantial noncompliance may not be material, the matter is material "'(1) if a reasonable man would attach importance to [it] in determining his choice of action in the transaction;' or (2) if the defendant knew or had reason to know that the recipient of the representation attaches importance to the specific matter 'in determining his choice of action.'" *Id.*

Only one of these criteria need be met to satisfy the materiality requirement; the City meets both. First, the City has admitted that compliance with environmental laws is an important contractual requirement. SOF in Plaintiff-Relator's Memorandum in Support of Her Motion for Partial Summary Judgment, Docket no. 95, ¶¶ 5-6. And the government has required in contracts that wastewater contractors operate sewage treatment and disposal facilities in compliance with applicable laws. *See Id.* ¶ 8; DSOF ¶ 141. The government's requirement and the City's admission of importance strongly suggest that any reasonable person would attach importance to

the requirement that the City operate its sewage treatment and disposal facility in accordance with the laws governing sewage treatment and disposal.

Second, the City knew or had reason to know that the federal agencies attached importance to environmental compliance. Not only does the government require environmental compliance in its federal contracts, but federal law requires that environmental compliance be a part of all federal contracts. The Clean Air and Water clause incorporated into the City's contracts is required to be inserted in all government contracts. Executive Order No. 11,738, 38 Fed. Reg. §25161 (Sept. 12, 1973). Likewise, 40 C.F.R. Ch. I § 15.31 provides that:

> Any agency responsible for promulgating contract, grant or loan regulations, shall ensure that its regulations require every nonexempt agency contract, grant, loan and every sub-agreement issued thereunder to include the following provisions:
>
> . . . (c) a promise by the contractor . . . that in the performance of the contract . . . he or she will comply with all requirements of . . . the CWA, including the requirements of . . . section 308 of the CWA, and all applicable . . . clean water standards. See Federal Acquisition Regulation, 48 C.F.R. §52.223-1 and 52.223-2. (See 40 C.F.R. Ch. I §15.31.)

In assessing materiality, it is appropriate to look not only to the contracts, but to the relevant statutes and regulations. *Universal Health Services, Inc. v. United States and Massachusetts ex rel. Escobar*, 136 S.Ct. at 1995 (materiality question focuses on "statutory, regulatory, or contractual" requirements); *United States ex rel. Conner v. Salina Regional Health Center*, 543 F.3d at 1218 (in implied certification cases, courts look to "the underlying contracts, statutes, or regulations" to determine materiality). Based on the contracts, the statutes, and the regulations, the City knew or had reason to know that the federal agencies it contracted with attach importance to the whether the City complies with the law in treating the agencies' wastewater.

More fundamentally, compliance with environmental laws is at the core of the City's contracts with the federal agencies; it is the very reason for their existence. If environmental compliance in the treatment and disposal of wastewater were not important to the federal agencies, they could just run a pipe to the nearest waterway. Instead, the agencies here contracted with the City to collect, treat, and dispose of their wastewater in compliance with environmental laws. Environmental compliance is required not only in the statutes themselves, but in the contracts and in federal regulations concerning sewage contractors. The Tenth Circuit noted the centrality of environmental compliance as affecting materiality another FCA case based on improper waste disposal, noting that "Plaintiffs also showed that the violations undercut the purpose of the contracts – the safe and permanent disposal of waste." *United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d at 1169. The purpose of the contracts here – the safe and permanent disposal of waste – is the same as the purpose of the contract in *Lemmon*, in which the Tenth Circuit found the defendant's impliedly false claims to be material.

The significance of environmental compliance in waste disposal contracts is especially true given the difficulty federal agencies have had with Clean Water Act compliance. The United States Government Accounting Office has found that agencies of the federal government, when treating and discharging their own wastewater, traditionally have had twice the noncompliance rate as that of nonfederal facilities. Statement of Additional Facts ¶ XX; *United States Department of Energy v. Ohio*, 503 U.S. 607, 630 (1992) (White, J., concurring in part and dissenting in part, noting that "[f]ederal facilities fail to comply with the Clean Water Act . . . twice as frequently as private industry"). The federal agencies here, rather than attempt to treat and discharge their own wastewater, with the associated risks and expenses, chose to contract with the City to properly treat and dispose of the sewage they generated.

As the Supreme Court described in *Escobar*, the fundamental inquiry regarding materiality is whether a contractor's noncompliance would affect the government's decisions to pay. With full knowledge that the City was not disposing of wastes under the contracts in compliance with environmental laws, would the federal agencies continue to maintain their contracts with Leavenworth, or would they choose a different contractor, say, the City of Lansing, which would be more likely to treat and dispose of sewage in compliance with the law? Given the government's interest in compliance with federal law, which is a reason for existence of the contracts with Defendant, it is highly likely that full knowledge of the City's environmental noncompliance would have "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property" to the City. *See* 31 U.S.C. § 3729(b)(1)(A). The City's monthly, impliedly false claims to the federal agencies were therefore material to those agencies to pay the City's invoices.

### C. In Submitting Claims for Payment Under the Sewage Contracts, the City Acted With Scienter, Supporting Plaintiff's FCA Claim.

### 1.     The Legal Standard of Corporate Scienter

Defendant contends that summary judgment is appropriate on all the FCA claims because Plaintiff cannot show that Defendant had the requisite scienter to give rise to liability under the law.  (Defendant's brief at pp. 36-45).  Defendant's argument fails, however, in part because it rests on a misstatement of the law on collective knowledge.

In order to establish corporate scienter under the False Claims Act, a plaintiff-relator must show that at least one employee "knew" of the fraud and that the fraud was material to the government's decision to pay. The FCA defines "knowing" and "knowingly" as having actual knowledge or acting in deliberate ignorance or reckless disregard of the truth or falsity of the information.   *See* 31 U.S.C. (b)(1)(i)-(iii). As Defendant correctly points out, to show fraud

under the FCA, a relator need not show intent to defraud. Instead, fraud is shown in an FCA case when there are sufficient facts from which a fact finder could conclude that a party acted with reckless disregard for the truth or falsity of the information.  Such an analysis is necessarily fact-intensive.  In this case, there is significant evidence from which a fact-finder could easily conclude that Defendants acted in "knowingly" under this definition; thus summary judgment is inappropriate.

Corporations pose unique problems in any "knowledge" inquiry under the FCA. For purposes of the Act, the knowing conduct of a corporation's employees and agents acting within the scope of their employment is imputed to the corporation. The term "person" applies to corporations, (*See* 1 U.S.C. §1 (1998)) and *respondeat superior* applies to FCA cases. *See United States v. United States Cartridge Co.,* 198 F.2d 456 (8th Cir. 1952), *cert denied*, 345 U.S. 910 (1953).

Defendant, relying on *U. S. ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908 (4th Cir. 2003) and *U.S.  v. Science Applications Intern Corp.*, 626 F.3d 1257 (D.C. Cir. 2010), asserts that to prevail on a request for summary judgment, Plaintiff may not rely on the so-called "collective knowledge" of City employees to establish scienter. That statement is incomplete and misleading, however, with regard to the Court's actual holdings in those cases and their application to this matter.

In *Harrison*, the Court expressly rejected the Defendant's request that it apply the so called "single actor" requirement in a false certification case.  In support of its decision, the *Harrison* court noted that such a rule (i.e., requiring a showing that the same employee knew of the impropriety and understood its importance) would permit corporations to avoid false certification liability in all circumstances by simply segregating contracting offices and making

46

their only function to execute contracts. *See Id,* at 919 (holding "we decline to adopt [Defendant] Westinghouse's view that a single employee must know both the wrongful conduct and the certification requirement. If we established such a rule, corporations would establish segregated 'certifying' offices that did nothing more than execute government contract certifications, thereby immunizing themselves against FCA liability."). As Defendant points out, the Court also rejected the notion that Relators in False Claims Act cases could rely on the "collective knowledge." *Id.* at 918. Instead, the *Harrison* court struck a middle ground, refusing to adopt either the collective knowledge or the single actor theory, and following the reasoning of the Eleventh Circuit, which held that a corporation could be held liable under the FCA even though its certifying employee was unaware of another employee's wrongful conduct. *See United States ex rel. Harrison,* 352 F.3d at 920 (citing *Grand Union Co. v. United States,* 696 F.2d 888 (11th Cir. 1983).

In *U.S. v. Science Applications Intern. Corp.*, 626 F.3d 1257, 1276, (D.C. Cir. 2010), also cited by Defendant, the D.C. Circuit also chose the middle ground finding that, if an employee "knew or recklessly failed to know that [defendant], by having [OCIs] and failing to disclose them, violated a requirement under its [Nuclear Regulatory Commission] contract that was material to the receipt of payment, then that finding would be enough to establish [defendant's] scienter. In addressing the government's concerns that rejecting the collective knowledge theory would open the door for corporations to compartmentalize knowledge and avoid meeting the "knowing" threshold, the D.C. Circuit observed that "if a plaintiff can prove that a government contractor's structure prevented it from learning facts that made its claims for payment false, then the plaintiff may establish that the company acted in deliberate ignorance or reckless disregard of the truth of its claims." *Id.* In reaching that conclusion, the Court focused on the

legislative history of the Act and Congress' statements that it adopted the broader definition of knowingly to "capture the 'ostrich-like' conduct which can occur in large corporations where' corporate officers . . . insulate themselves from knowledge of false claims submitted by lower-level subordinates.") *Id at 1274-1276,* (citing S. Rep. No. 99-345, at 6 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5272.)

The City of Leavenworth now claims that Plaintiff must show more than the "collective knowledge" of its employees to successfully oppose a summary judgment motion on the scienter issue. But Leavenworth, with its separate contracting, financing, and billing departments is precisely the kind of corporate structure discussed in the cases cited above.   Thus, if Plaintiff can show that government contractor's structure prevented it from learning facts that made its claims for payment false, then Plaintiff may establish that the company acted in deliberate ignorance or reckless disregard of the truth of its claims which amounts to a showing that the company "knew" of the breach.  *See U.S. v. Science Applications Intern. Corp. III,* 626 F.3d at 1276.   As will be demonstrated below, Plaintiff can present significant evidence from which a reasonable fact finder could find in her favor on the scienter issue. Thus, summary judgment is inappropriate.

### 2.   Legitimate Issues of Material Fact Exist Regarding Whether Defendant Had the Requisite Corporate Scienter in Committing Environmental Violations.

Relying heavily on two cases it identifies as "instructive" (Doc. 93 at 38),--*U.S. ex rel. Burlbaw v. Orenduff*, 548 F.3d 931 (10th Cir. 2008), and *Gonzales v. Planned Parenthood of Los Angeles,* 759 F.3d 1112 (9th Cir. 2014)—Defendants contends that Plaintiff loses on the scienter argument because she cannot meet her burden of showing 1) the environmental practices identified in Plaintiff's complaint violated its environmental regulatory obligations; and 2) that those violations were material to the federal agencies' decision to pay.  Essentially, Defendant

argues that KDHE has approved the environmental practices in question, and Defendant reasonably relied on KHDE's statement. Thus, Plaintiff's expert's opinion regarding whether there were environmental violations is immaterial because Defendant did not have the requisite scienter to commit a FCA violation.  Defendant's brief at p. 39.

But *Burlbaw* and *Gonzales* are different from this case.  *Burlbaw* involved an honest mistake where the Defendant, on behalf of New Mexico State University, relied in good faith on a Department of Education's listing of the university as a "minority institution" when applying to the Department of Defense to obtain set aside contracts.  *U.S. ex rel. Burlbaw v. Orenduff*, 548 F.3d at 931.  The court specifically noted that there was nothing in the record to support a finding that anyone working for Defendant had lied to the Department of Education or had knowingly withheld pertinent facts in order to get the University placed on the list.  *Id.* at 953-54.  Similarly, in *Gonzales*, there was no evidence that the defendant had knowingly withheld facts, and there was also evidence that the defendant taken proactive steps to fully disclose all pertinent facts to the government contractor.  Thus, the court ruled that the defendant lacked the scienter necessary to support a FCA claim.  *Gonzales v. Planned Parenthood of Los Angeles,* 759 F.3d at 1116.

In contrast, the case law is well settled when a defendant fails to disclose all pertinent facts to a government agency which approves conduct, it is not entitled to rely on that approval to avoid FCA liability.  *See United States ex rel A+ Homecare, Inc. v. Medshares Mgmt. Group*, 400 F.3d 428, 454 n.21 (6th Cir. 2005); *United States ex rel. Hagood v. Sonoma Cnty. Water Agency*, 929 F.2d 1416, 1421 (9th Cir. 1991)(requiring disclosure of "all the underlying facts"). *See also Massachusetts v. Mylan Labs.*, 608 F. Supp. 2d 127, 149 (D. Mass. 2008);

Here, KDHE's alleged assurances are meaningless because they relied on incomplete and misleading evidence at best and outright disputed evidence at worst.  For instance, in defending

49

its practice of dumping septage behind the wastewater treatment plant, Defendant relies on the

June 2012 letter from KDHE that it had inspected the plant in April of that year and found no

problems. But, as set forth in SOF 64 of Doc. 95, the operators were shocked that KHDE not

only conducted an extremely cursory inspection, but the inspector never actually inspected the

dump site behind the plant.  Further, McDonald conceded that he did not know what KDHE was

told about the City's dumping practices, what KDHE inspected during the roughly 15 minutes it

inspected the plant, or what the basis was for KDHE approval of the City's dumping practices.

(SOF 62 of Doc. 95).  Thus, any conclusions the inspector may have drawn about the propriety

of dumping practices were flawed because there is no evidence KDHE was given all the

pertinent information about the dumping.

KDHE's "approval" of the discharges related to the broken sewer pipe is similarly

suspect.  Indeed, McDonald, speaking as the corporate representative for the City, acknowledged

that he was unaware of any documents supporting his statement that KDHE had approved the

City's practice of discharging effluent in clear violation of its NPDES permit and he did not

know who at KDHE had told the City their permit violations were permissible. Indeed, the

record contains no evidence of any such approval from KDHE, and Montgomery's identity was

not disclosed to Plaintiff until this Motion.

In any event, the City acknowledged that its permit did not allow it to discharge water

directly to Five Mile Creek.  (SOF 46).  KDHE cannot simply authorize Leavenworth to violate

federal law.[2] (*United States ex rel Dye v. ATK Launch Sys., Inc.*, 2008 U.S. Dist. LEXIS 85331,

at *9 (D. Utah Oct. 16, 2008); *United States v. Aging Care Home Health Inc.* 2006 U.S. Dis.

LEXIS 73047, at *4 (W.D. La. Oct. 6, 2006); *United States ex rel. Jordan v. Northrop Grumman*

---

[2] The City acknowledged that its permit did not allow it to discharge water directly to Five Mile
Creek.  (SOF 46).

*Corp.*, 2002 U.S. Dist. LEXIS 26622 at *20 (C.D. Cal. Aug. 5, 2002)("[A] Government contracting officer cannot waive compliance or authorize a contractor to violate federal law or regulation."); *United States ex rel. Mayman v. Martin Marietta Corp.,* 894 F.Supp. 218, 223 (D. Md. 1995).  Thus, unlike the defendants in *Gonzales* and *Burlbaw*, where there was good faith honest mistake, there is evidence here from which a reasonable fact-finder could easily conclude that the City obtained KHDE's approval only by providing incomplete and misleading information about its environmental malfeasance.

But even if one accepts that these facts were fully disclosed, (which, as set forth above, they were not), the defense that Defendant relied on KDHE's guidance does not shield it from False Claims Act liability.  First, McDonald and Klingler are highly trained professionals with licenses that require them to have an understanding of the environmental laws the WWTP was meant to administer.  If they had a question about what their obligations were under the contract, they had an obligation to investigate it.  *See MWK Int'l v. United States* 2 Cl. Ct. 206, 209-10 (1983)(a government contractor has a duty to submit an inquiry concerning contract provisions to the designated contracting officer. If the government contractor fails to so inquire, the contractor cannot later rely on its uninformed interpretation of contract provisions to circumvent the government's interpretation). McDonald and Klingler either knew or should have known that the City's practices were not in compliance with those obligations.  Indeed, simple common sense should have led these highly trained professionals to at least undertake some inquiry into the legality of dumping raw sewage on the open ground or discharging raw sewage and other wastewater to a body of water not identified in a permit.  Their reckless indifference to plain language obligations of the contract and to obvious violations is more than adequate to show the necessary scienter to win a FCA claim.

Second, Defendant cannot show that it undertook a "diligent inquiry" to ensure compliance with is contractual obligations with the federal agencies.  Indeed, Defendant has presented no evidence that it ever made *any* inquiries, diligent or otherwise, to ensure that its wastewater treatment plant was providing the services and in the manner for which the government was being billed. Instead, contracts were entered and renewed, invoices were sent to the government, and no one ever made "diligent inquiry" to Klingler or anyone else at the wastewater treatment plant to ensure compliance with the terms of the contract.  This fact is more than enough to meet the burden of showing deliberate ignorance or reckless disregard for the truth as required in 3729(b)(1).

Indeed, Ruby Maline, the City's finance director, testified that while she was familiar with the federal contracts at issue, her familiarity began and ended with an analysis of whether the invoices were consistent with the contractual obligations.  Additional statement of facts 15. This kind of corporate structure is precisely the kind of organization  the court in *Science Applications Intern. Corp.* described.  In this context, following the instructions of the controlling law, Plaintiff can make her showing of corporate scienter by showing that Leavenworth "recklessly failed to know the truth."  As set forth above, using this standard, Plaintiff has identified legitimate issues of material facts sufficient to establish corporate scienter.[3]

Thus, Plaintiff has met her two-prong burden under the FCA, and she has shown the requisite scienter regarding the City's multiple false claims.  Summary judgment is therefore inappropriate.

---

[3] With respect to other issues Defendant raises related to scienter, Plaintiff incorporates here and relies on her arguments in her Motion for Partial Summary Judgment, Docket nol. 95.

**II.      The City is Not Entitled to Summary Judgment on Plaintiff's FEMA-Related Claim.**

The City seeks summary judgment on Plaintiff's FEMA-Related claims.  That issue has been fully briefed in Plaintiff's Motion for Partial Summary Judgment (Doc. 95). Those arguments are incorporated here by reference with the additional note that Defendant's reliance on Les Money's affidavit is misplaced.  Money indicated that he spoke with City officials who told him of the broken sewer pipe.  He does not identify with whom he spoke, and his statement is contrary to McDonald's email in Exhibit 14.  In any case, Money was not FEMA representative. He was merely the liaison between the City and FEMA representative and McDonald testified that he did not correct his statement to FEMA in the email.

**III.     Summary Judgment is not appropriate on Ms. Coffman's False Claims Act Retaliation claims.**

The City demands summary judgment on Plaintiff's retaliation claim under 3730(h). Significant legitimate issues of material fact make summary judgment wholly inappropriate.

**A.  False Claims Act Retaliation Cases**

Congress amended the False Claims Act in 1986 to add the anti-retaliation provisions in 31 U.S.C. § 3730(h).  In 2009, Congress again amended the Act, as part of the Fraud Enforcement Recovery Act of 2009 that was passed in response to the global economic meltdown the previous fall.  Prior to the 2009 amendments, 3730(h) required an employee to prove that they had either already reported violations to the government, or that their conduct was in furtherance of an FCA investigation.  The 2009 amendments lessened the notice burden on the relator and offered protection not just for those who made FCA claims, but also for all those who undertook any actions or efforts to stop fraudulent activity.  Under the new language of 3730(h) "[a]ny employee who is discharged, demoted, suspended, threatened, harassed, or in

any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee…in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter" shall be entitled to all relief necessary to make the employee whole.

A relator asserting a claim under § 3730(h) must show (1) she engaged in "protected conduct," (i.e., acts done in furtherance of an action under § 3730) and (2) that she was discriminated against because of her "protected conduct." See e.g., *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 736 (D.C.Cir.1998) (quoting S.Rep. No. 99–345, at 35 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5300). The legislative history of the amendments make clear that the "because of" standard tracks the federal whistleblower protection statutes, and

> has developed into a two-pronged approach. One, the whistleblower must show the employer had knowledge the employee engaged in "protected activity" and, two, the retaliation was motivated, *at least in part*, by the employee's engaging in protected activity. Once these elements have been satisfied, the burden of proof shifts to the employer to prove affirmatively that the same decision would have been made even if the employee had not engaged in protected activity.

S.Rep. No. 345 at 35, 99th Cong., 2d Sess. 35 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5300.  Emphasis added. *See also, U.S. ex rel. Erickson v. Uintah Special Servs. Dist.,* 268 F. App'x 714, 716 (10th Cir. 2008).

Courts apply the *McDonnell Douglas* analysis to FCA retaliation claims in situations where there is no direct evidence of retaliation.  Under this framework, once Plaintiff has demonstrated a *prima facie* case of retaliation, the burden shifts to the employer to provide a legitimate non-discriminatory reason for the employment decision. After that showing is made, it falls to Plaintiff to demonstrate that the alleged legitimate reason is pretext for unlawful motivation. Such a showing can be made in two ways:  1) Plaintiff can show that the proffered reason is factually false; or  2) Plaintiff can show that unlawful motivation was part of the

decision by focusing on "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered reason[ ]," such that a reasonable fact finder could deem the employer's reason "unworthy of credence." *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1218 (10th Cir. 2013), citing *Garrett v. Hewlett–Packard Co.,* 305 F.3d 1210, 1217 (10th Cir.2002).

**B.  Plaintiff has made her *prima facie* showing of retaliation under 3730(h).**

**1.  Protected Action:**

Defendant concedes that Plaintiff, in reporting concerns over possible fraud in the submission of the broken sewer pipe to FEMA, has demonstrated that she has engaged in a protected action. (Defendant's brief at p. 46).  Indeed, there is no question that Plaintiff's inquiries into the work orders for the broken sewer pipe repair and reports of concerns of fraud to Miller constituted protected action.  Plaintiff, like virtually every other member of the staff at the WWTP, knew the sewer pipe had been broken before the flood.  When she learned from Bennetts and Smith that FEMA had paid for the broken sewer pipe, and when the work orders for the repairs were not where they were supposed to be, she reasonably believed that the City had defrauded FEMA by submitting a bill for a repair that predated the flood that triggered the authorization for funding.  Raising concerns about FEMA fraud with her supervisors was clearly a protected action, even if it ultimately turned out that FEMA had not paid for the broken sewer pipe.  *See Yesudian,* 332 U.S. App. D.C. at 740(a retaliation claim can stand even if Plaintiff ultimately does not find the evidence to support the underlying FCA claim). *See also Hoyte v. Am. Nat'l Red Cross*, 518 F.3d 61, 71 (D.C. Cir. 2008);(internal quotation marks omitted); *accord*, *Schuhardt v. Washington Univ.*, 390 F.3d 563, 567 (8th Cir. 2004); *Fanslow v. Chicago Mfg.,* 384 F.3d 469, 480 (7th Cir. 2004); and *Moore v. Cal. Inst. of Tech*, 275 F.3d 838, 845 (9th Cir. 2002)(holding that protected actions related to the False Claims Act satisfy the good faith

requirement when 1) the employee in good faith believes, and 2) a reasonable employee in the same or similar circumstances might believe, that the employer is committing fraud, or has committed fraud, against the government).

Additionally, in reporting concerns about ongoing problems with maintenance and improper dumping at the plant, Plaintiff was essentially raising concerns about the City's compliance with its environmental obligations under its various permits as well as with its contractual obligations with various federal agencies.  This conduct was also protected under the law.  Indeed, the law under 3730(h) does not require that a relator identify a particular concern as a report of fraud or an FCA claim.  Instead, a relator engages in a protected action subject to the protections of 3730(h) if she merely engages in an activity designed to stop the fraud, even if she does not identify it as such.  *See Yesudian,* 332 U.S. App. D.C. at 741-42 (holding there is no requirement that a plaintiff know his investigation could lead to a False Claims Act action). See 31 U.S.C. 3730(h); also *U.S. ex rel. Dorsey v. Warren E. Smith Community Mental Health/Mental Retardation and Substance Abuse Centers*, 1997 WL 381761 (E.D. Pa. 1997) at *5, (holding that, given the goal of the FCA, protected action should be interpreted broadly.).  In this case, Plaintiff's efforts to bring the plant into compliance with contractual and permit obligations are clearly efforts to stop one or more violations of the FCA and are therefore protected actions.

### 2.  The retaliation against Plaintiff was motivated, at least in part, by her protected activity.

Prior to Plaintiff's taking over the role of Assistant Superintendent and making waves regarding repairs, safety concerns, and the FEMA issue, Klingler treated Plaintiff very well. The other operators privately referred to her as the "Princess" because Klingler, widely perceived as difficult to work with, liked her and treated her well. She received special treatment from

Klingler in terms of training she received, and she rose rapidly through the ranks of the WWTP

under Klingler's supervision.  Exhibit 5, Bennetts Deposition,174:23-25; Exhibit 6, Smith

Deposition, 47: 10-14, 49: 15-18.  Plaintiff was the City's employee of the second quarter of

2012, and then received the award for employee of the year in 2012.   Pretrial Order, ¶ 7.

However, after Plaintiff expressed concerns about possible FEMA fraud and used her position of

authority to inquire  into ongoing maintenance problems and improper dumping at the plant,

everything changed.  Klinger harassed her, overly scrutinized her work, dramatically increased

her workload, gave her long lists of busy-work type tasks to complete, and then ignored her.

Additional Facts, ¶ 6.  Her work hours increased dramatically and Klingler ignored her repeated

requests for help and her reports that she was being pushed to the brink of exhaustion and a

mental breakdown. She sought assistance through her chain of command for help, but, at each

level, her supervisors ignored her.  Klingler gave her a "training" memorandum filled with minor

nitpicky "training" items on which he had inexplicably sought the assistance of McDonald and

which he had not previously felt were important enough to call to Plaintiff's attention.  Plaintiff

repeatedly reported retaliation related to her various inquiries but her reports fell on deaf ears.

She requested time to study for her Operator IV test, which she knew she needed to keep her job.

However, Klingler, engaging in a tactic he had used in the past to get rid of employees he did not

like, refused to give her time to study for her test. Exhibit 6.

        The abrupt change in Plaintiff's working conditions and in the way that Klingler treated

her, almost immediately on the heels of her protected actions, described above, provides more

than enough evidence from which a juror could reasonably conclude that the harassment was

motivated at least in part by the protected action.  See *Sullivan v. Nationwide Life Ins. Co*., 720

F. Supp. 2d 483, 515 (D. Del. 2010))("A causal connection between protected activity and

adverse action may be inferred from: (1) an unusually suggestive temporal proximity between the two; (2) an intervening pattern of antagonism following the protected conduct; or (3) the proffered evidence examined as a whole.")(citing *Kachmar v. SunGuard Data Sys.*, 109 F.3d 173, 177 (3rd Cir. 1977)). See also *Quorum v. Health Resources, LLC,* 485 Fed. Appx. 783, 792 (6th Cir. 2012)(holding that termination one month after learning that employee filed an FCA suit gives rise to an inference of retaliatory motive).

Thus, Plaintiff has made her prima facie showing of retaliation under 3730(h), both with regard to the FEMA fraud issue and the other FCA issues regarding compliance with contractual and permit obligations to federal agencies.  Defendant contends that summary judgment is nonetheless appropriate because Plaintiff disclosed her concerns about FEMA fraud to Miller, and Miller said that he had not told McDonald, Klingler, and Lanter (whom they claim made the employment decision) about Plaintiff's concerns.  Thus, Defendant contends that because Plaintiff cannot show that the decision-makers had notice of her protected action, she fails the *prima facie* test of retaliation under 3730(h).  (Defendant's brief at 46-47).

Defendant's argument fails.  First, Defendant has taken an overly narrow view of Plaintiff's protected action.  Indeed, Defendant has focused on Plaintiff's claims of FEMA fraud, but completely ignored Plaintiff's other protected activities as set forth above.  There is no question that Klingler and McDonald were decision-makers and knew that Plaintiff had been making multiple inquiries into problems with various maintenance issues she had discovered.  Thus, with regard to the second protected action described above, Plaintiff clearly meets her requirements under the notice section of the test.  See *U.S. ex rel. George v. Boston Sci. Corp., 864 F. Supp. 2d 597, 608 (S.D. Tex. 2012),citations omitted,* (noting that the notice prong is satisfied when the employee complained directly to supervisors).

58

Additionally, with regard to the notice of the FEMA issue, Plaintiff testified that Miller must have spoken with McDonald about their conversation because McDonald knew things she had disclosed only to Miller.  Additional Fact, ¶ 12.  On these facts, Miller's self-serving denial that he had not spoken with McDonald should be given very little credence.  Indeed, McDonald testified in the City's deposition that while Plaintiff had reported retaliation to him, he did even know if he had inquired as to the basis for the retaliation.  McDonald Deposition 103:19-104:1. It defies logic that, as a manager, McDonald would not have undertaken at least a cursory investigation into Plaintiff's complaints—that is, unless he were already aware of the circumstances giving rise to the retaliation. Instead, given that McDonald and Klingler mysteriously knew things Plaintiff had disclosed only to Miller, and given McDonald's incongrously incurious response to Plaintiff's reports of retaliation, a reasonable fact-finder could infer that if Miller did not outright tell McDonald and his colleagues about his conversation with Plaintiff, he hinted or suggested that Coffman was creating trouble and should be stopped.  Imputing knowledge to Miller under these facts is akin to a cat's paw argument recognized by the Supreme Court in *Staub v. Proctor Hospt.,* 562 U.S. 411 (2011) and endorsed by the 10th Circuit in *Thomas v. Berry Plastics Corp.,* 803 F.3d 510, 515 (10th Cir. 2015).  In a typical cat's paw case, the subordinate supervisor has the retaliatory animus and infects the decision-maker, who is unaware of the discriminatory animus. In this situation, Plaintiff asserts a "reverse" cat's paw argument, where the "infection" went down the chain of command rather than going up it.[4]

---

[4] The 10th Circuit has not yet addressed whether a subordinate can be liable for discrimination in a "reverse cat's paw" situation. *Muhammad v. Hall*, 674 F. App'x 810, 814 (10th Cir. 2017).

In any event, the threshold for notice in this type of action is low.  For purposes of establishing notice under 3730(h), a relator need not have expressly stated an intention to bring a claim under the FCA. Instead, if a fact finder could reasonably infer that the decision-makers knew of the protected action, that is sufficient to make the threshold showing under 3730(h). *See United States ex rel. George v. Boston Scientific Corp*. 864 F.Supp. 2d 597, 609 (S.D. Texas 2012)(finding the notice requirement satisfied when relator did not directly report concerns of fraud to the decision-maker, but he was present in the room when she spoke of her concerns).

Here, there is ample evidence from which a fact-finder could reasonably infer that Miller told McDonald and Klingler about Plaintiff's FEMA fraud concerns or, based on a reverse cat's paw theory, that Miller improperly "infected" Klinger and McDonald.  First, as set forth above, until Plaintiff began inquiring about possible fraud in the FEMA submissions, her employment record with the City was spotless. She was Charlie Klingler's "princess," and she rose rapidly through the ranks to achieve the high level management position of assistant superintendent.  She was employee of the year in 2012, and her work was well regarded and well received by all members of management, even by Klingler, who was reportedly impossible to get along with. (Bennetts deposition).

Klingler's demeanor and treatment of Plaintiff changed, however, almost at the exact time when Plaintiff began making inquiries about possible FEMA fraud and about ongoing problems with maintenance at the plant.  The proximity in time between Plaintiff's protected activity and the abrupt change in her working conditions supports an inference of notice and retaliation, such that summary judgment is inappropriate on these facts.

### 3. Defendant's purported "legitimate" employment decisions were pretext for Retaliation.

Defendant further contends that summary judgment is inappropriate because Plaintiff cannot show that the reasoning behind the demotion was pretext for illegal retaliation. Defendant asserts that no other operator was given an extension of time in which to pass their operator's test; thus, Plaintiff's demotion because she did not pass her operator's test cannot be retaliation related to her protected activity.  (Defendant's brief at p. 47-48).  Once again, Defendant has taken a self-serving, overly narrow view of Plaintiff's allegations of retaliation.

As set forth above, Plaintiff's allegations of retaliation are far broader than just management's refusal to give her an extension of time in which to take her operator's exam. Instead, the failure to give her an extension of time was simply the culmination of a long campaign of harassment on the heels of Plaintiff's protected actions.  As set forth above, after Plaintiff's protected actions, Klingler began harassing and threatening her position at the WWTP, overly scrutinizing her work, letting her know he was involving upper management in minor "training" concerns, giving her an enormous workload, refusing to help her, and basically "checking out" of his work at the plant.  Operator Smith observed that Klingler had used the tactic of overworking employees to keep them from studying for their tests in the past as a way to get rid of a problem employee.  Exhibit 6, Smith Declaration. These actions amount to harassment and are clearly covered under the language of the anti-retaliation provision of the False Claims Act, which protects relators from any kind of threatening or harassing conduct, not just from adverse actions related to employment.  *See* 31 U.S.C. ¶ 3730(h).  Thus, aside from the issue whether management's refusal to extend her time to take her Operator's IV test was retaliatory, many other instances of retaliation support Plaintiff's claim.

Defendant has not provided any explanation for why Klingler engaged in a campaign of harassment against Plaintiff when he had previously adored her.  Plaintiff's resignation letter, submitted as part of her constructive discharge claim, specifically references her involvement in an investigation at the plant, together with her inquiries into possible FEMA fraud as the basis for the retaliation.  Thus, there is ample evidence from which the fact-finder could reasonably find retaliation related to Plaintiff's protected activities and Plaintiff has met her burden of showing pretext.  This court therefore should deny Defendant's request for summary judgment on Plaintiff's retaliation claim under 3730(h).

### IV.   Plaintiff's Common-Law Retaliation Claims are not Precluded by the FCA.

Relying on Judge Lungstrum's decision in *Lipka v. Advantage Health Grp.,* 2013 WL 5304013 (D. Kan. Sept. 20, 2013), Defendant asks this court to grant summary judgment on Plaintiff's common-law claims for whistleblower retaliation and retaliatory discharge (Counts III and IV).  Defendant contends that the False Claims Act provides an adequate alternative remedy for Plaintiff and that the common-law claims should be precluded under the alternative remedies doctrine.  (Defendant's brief at pp. 48-49).

But in *Lipka,* Judge Lungstrum noted that the Plaintiff had indicated that she was pleading retaliation under 3730(h) and common-law retaliation in the alternative and she did not suggest that her common-law claims were meant to address anything different from her claims under the False Claims Act.  *Id. at * 7.*  In contrast, as indicated in Counts III and IV of her amended complaint (ECF 24), Plaintiff has alleged retaliation and whistleblowing based not only on fraud against the government, but also on safety issues at the plant. (See e.g., ECF 24, paragraph 227).  Retaliation for reporting unsafe working conditions at the plant may not be covered by the FCA, but is clearly covered by the common-law whistleblower's claim.  Because

it is unclear whether the fact-finder would find retaliation based on reports of fraud, maintenance, and improper dumping or reporting unsafe working conditions, or both, the False Claims Act does not provide an adequate alternative remedy, and summary judgment is inappropriate.

**V.      Plaintiff has Substantially Complied With the Notice Provisions of the Kansas Tort Claims Act, K.S.A. 12-105b.**

Defendant seeks summary judgment on Plaintiff's claims of negligent infliction of emotional distress, alleging that, because she did not provide the proper notice under section 105b of the Kansas Tort Claims Act, her claims must fail.  (Defendant's brief at p. 49-50). Defendant's argument fails because it does not take into consideration the unique circumstances of this case.

It is true that the Kansas Tort Claims Act requires a municipality to have 120 days to review a claim before a tort can be filed.  K.S.A. 12-105b(d).  However, as this Court is well aware, under section 3730(b)(2) of the False Claims Act, a relator must file her claim under seal for at least 60 days.  The seal provision was designed to address concern that a relator filing a FCA claim would alert defendants to a pending criminal investigation.  S. Rep. No. 99-345, pp. 23-24 (1986).  It is not uncommon, however, for the US Attorney to request that the seal be extended for a period of time. That is precisely what happened in this case.  In the instant case, the US attorney provided its decision on intervention on April 15, 2014, some 176 days after the initial complaint was filed under seal.  This Court ordered the matter unsealed 12 days later, on April 27, 2015.  Thus, with regard to the initial complaint, there is no way Plaintiff could have complied with the notice requirements of 105b without violating the seal requirements of 3730(b)(2).   The amended complaint was filed under seal on February 25, 2016 (ECF 24), but given the previous unsealing on the original complaint, Defendant was already well aware of

Plaintiff's claims.[5]  In fact, national and local news media, including the Washington Times, the

Topeka Capital Journal, and the Leavenworth Times reported on the story, and Scott Miller gave

a comment to the Leavenworth Paper about the case.  See Exhibit 9. And, as demonstrated in

Exhibit 10, once Defendant became aware of Plaintiff's lawsuit, it began taking measures

(including revising documents) to put itself in the best light for defending itself.

Additionally, given the failure of any attempts at settlement of these claims, it is difficult

to believe that Defendant would have done anything other than deny the request for recovery,

which would have then permitted Plaintiff to file her claim.  On these facts, there is no question

that Plaintiff substantially complied with the notice provisions and Defendant was not prejudiced

in the slightest that formal notice was not given.  The notice provisions of the KTCA are

designed to give the municipality an opportunity to review potential claim and "ascertain the

character and extent of the injury sustained."  *Holmes v. Kansas City,* 101 Kan. 785, 786 (Kan.

1917).  Here, where the City had ample time to review (and deny) Plaintiff's claims and to

amend documents to put themselves in better light for their defense of the lawsuit, that purpose is

clearly met.  To deny Plaintiff the opportunity to proceed on these grounds would, therefore, be

the ultimate elevation of form over substance.

### VI.   Plaintiff has Demonstrated Adequate Physical Injury to Support Her Negligent Infliction of Emotional Distress Claim.

Defendant asserts that Plaintiff has not demonstrated that she suffered a qualifying

physical injury; thus her claim for negligent infliction of emotional distress fails as a matter of

law.  (Defendant's brief at p. 50-51).  Defendant's argument misstates the facts.

Kansas courts allow for recovery for physical injury resulting from emotional harm when

the physical injury complained of occurs "contemporaneously with or shortly after the incident

---

[5] The amended complaint contained new False Claims Act claims, but did not change the claims for recovery for common-law retaliation.

causing the emotional distress." *Hoard v. Shawnee Mission Med. Ctr.,* 233 Kan. 267, 275, 662 P.2d 1214, 1220 (1983).  In this case, as demonstrated in Plaintiff's medical records, Plaintiff experienced a qualifying physical injury – chest pain – which required visits to the emergency department and to cardiologists.  Exhibit 7.[6]  These types of symptoms go beyond the stress related symptoms identified in the cases Defendant cites.  Plaintiff regularly sought counseling for her mental disease associated with the stress and even began taking medication to treat the stress.  Thus, Plaintiff experienced significant physical manifestations of stress, which were more than just generalized symptoms of emotional distress. As such, there is adequate evidence from which a trier of fact could conclude that there was a qualifying physical injury.  Summary judgment is therefore inappropriate.

### Conclusion

For all of the foregoing reasons, the City's request for summary judgment should be denied in its entirety.

Respectfully submitted,

*/s/ Mark V. Dugan*
Mark V. Dugan, KS Bar # 23897
Heather J. Schlozman, KS #23869
Dugan Schlozman, LLC
8826 Santa Fe Drive, Suite, 307
Overland Park, Kansas  66212
Telephone: (913) 322-3528
Facsimile: (913) 904-0213
heather@duganschlozman.com

And

*/s/ Robert Collins*

---

[6] Exhibit 7 is confidential and is being submitted blank. It will be supplied *in camera* in accordance with the Protective Order in this case.

Robert Collins
Collins Law Office, LLC
P.O. Box 4786
Olathe, KS 66063
(913) 538-7472
robert@collinslegal.com

**Attorneys for Plaintiff-Relator**

## CERTIFICATE OF SERVICE

I, Mark V. Dugan, certify that on the 11th day of August 2017 that I filed the foregoing electronically, thereby providing service on the following:

Terelle A. Mock
Andrew Holder
Fisher, Patterson, Sayler & Smith, LLP
3550 S.W. 5th Street
Topeka, KS 66606
tmock@fisherpatterson.com
aholder@fisherpatterson.com

**Counsel for Defendant**

And

Robin Anderson
Robin.Anderson@usdoj.gov
Office of the United States Attorney
500 State Avenue, Suite 360
Kansas City, Kansas 66101

**Counsel for United States of America**

*/s/ Mark V. Dugan*